UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LOUIS R. RINALDI *and* ANDREA K.
ZAMBRANO,

                                    Plaintiffs,

                    -v-

KEVIN SYLVESTER, *et al.*,

                                    Defendants.

No. 24-CV-272 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Daniel S. Alter, Esq.
Lisa Florio
Abrams Fensterman, LLP
White Plains, NY
*Counsel for Plaintiffs*

Michael G. Santangelo, Esq.
Law Office of Michael G. Santangelo PLLC
New York, NY
*Counsel for Plaintiffs*

Brian S. Sokoloff, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiffs Louis Rinaldi ("Rinaldi") and Andrea Zambrano ("Zambrano" and together

with Rinaldi, "Plaintiffs") bring this Action pursuant to 42 U.S.C. §§ 1983 & 1988 and state law

against Kevin Sylvester ("Sylvester"), in his personal capacity and in his capacity as the former

Chief of Police for the Village of Ossining, Emily Hirshowitz ("Hirshowitz"), in her personal

capacity and in her capacity as a Police Officer for the Village of Ossining, Stuart Kahan

("Kahan" and together with Sylvester and Hirshowitz, the "Individual Defendants"), in his

personal capacity and in his capacity as Corporation Counsel for the Village of Ossining, the

Board of Trustees for the Village of Ossining (the "Board"), and the Village of Ossining (the

"Village" and together with the Individual Defendants and the Board, "Defendants").  (*See*

Second Am. Compl. ("SAC") (Dkt. No. 32).)[1]  In the SAC, Plaintiffs raise myriad claims against

Defendants arising under federal and state law.  (*See generally id.*)

Before the Court is Defendants' Motion to Dismiss Plaintiffs' SAC, pursuant to Federal

Rule of Civil Procedure 12(b)(6) (the "Motion").  (*See* Not. of Mot. to Dismiss (Dkt. No. 38).)

For the reasons stated below, the Motion is granted in part and denied in part.

<u>I. Background</u>

<u>A. Factual Background</u>

The following facts are drawn from Plaintiffs' SAC, as well as exhibits attached thereto

and various exhibits submitted by the Parties, and are taken as true for the purposes of resolving

the instant Motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).[2]

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

[2] Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002); *accord Doe v. County of Rockland*, No. 21-CV-6751, 2023 WL 6199735, at *1 (S.D.N.Y. Sept. 22, 2023).  "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Thomas*, 232 F. Supp. 2d at 275; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (same).

In connection with their Motion, Defendants submit the settlement agreements between the Village and Zambrano and the Village and Rinaldi, as well as various filings from the original state court action.  (*See* Decl. of B. Sokoloff, Esq. in Supp. of Mot. ("Sokoloff Decl.") (Dkt. No. 39).)  In connection with their Opposition, Plaintiffs submit the same settlement agreements and a copy of the Village of Ossining Police Department General Order #3.00.  (*See* Decl. of D. Alter, Esq. ("Alter Decl.") (Dkt. No. 49).)  The Court can consider the settlement

1.  The Parties

Rinaldi, a resident of Westchester County, was hired by the Village as an officer of the

Village of Ossining Police Department ("VOPD") on August 3, 2015.  (SAC ¶ 22.)  Zambrano, a

Hispanic woman and also a resident of Westchester County, was hired by the Village as a VOPD

officer on August 1, 2016.  (*Id.* ¶ 23.)

Sylvester was appointed the chief of police of the VOPD in January 2016.  (*Id.* ¶ 1.)

Sylvester was "widely known throughout the community" and was "very popular with many

elected officials, including the Village's mayor and [the Board]."  (*Id.* ¶¶ 1–2.)

At all times relevant to this Action, Hirshowitz was a police officer employed by the

VOPD, (*id.* ¶ 25), Kahan was the corporation counsel for the Village, (*id.* ¶ 26), and the Board

was "the elected legislative body for the Village, with the authority to appoint the Village police

chief and to adjudicate VOPD disciplinary charges," (*id.* ¶ 27).

2.  Sylvester's Tenure as Chief

As chief of police, Sylvester acted as a final decision and policymaker "in all matters

involving the daily operations of the VOPD," including "supervision of subordinate[s],"

"establishing rules of professional police conduct," and "investigating VOPD officers regarding

fitness for duty and alleged attendance violations."  (*Id.* ¶ 24.)  Although the Board was

---

agreements as they are incorporated into the SAC by reference.  *See Markatos v. Citibank, N.A.*,
760 F. Supp. 3d 70, 74 (S.D.N.Y. 2024) (noting that "a court may incorporate documents
referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the
complaint clearly and substantially references the documents, and (3) the document's
authenticity or accuracy is undisputed," and incorporating the contract underlying the breach
claim).  Moreover, the Court can take judicial notice of the state court filings and the General
Order.  *See, e.g.*, *Press v. Primavera*, 685 F. Supp. 3d 216, 224–25 (S.D.N.Y. 2023) (collecting
cases and noting that "[c]ourts in this District routinely take judicial notice, on a motion to
dismiss, of public filings like this, including filings made on court dockets" and government
orders publicly online).

ostensibly, together with Sylvester, a "policymaker regarding VOPD internal disciplinary matters," the Board "consistently acquiesced to Sylvester's disciplinary demands regarding VOPD personnel." (*Id.* ¶ 29.) Indeed, "Sylvester repeatedly told VOPD personnel that he was in complete control of the [VOPD] and that the Trustees followed his directions." (*Id.* ¶ 2.)

During his tenure as chief, Sylvester allegedly "abused his authority and harassed numerous police officers." (*Id.* ¶ 30.) In particular, by "[u]sing personal harassment, threats of unfounded disciplinary action, discriminatory and immediate suspensions without pay or medical benefits, and fabricated disciplinary charges, Sylvester repeatedly coerced VOPD officers to resign from the force." (*Id.*) Moreover, Sylvester—who "wielded power and influence over fellow police chiefs" by virtue of his leadership role in various associations—would "vindictively obstruct[] [the former VOPD officers'] efforts to find police work elsewhere" by contacting other police departments in Westchester County to dissuade them from hiring the retired officers. (*Id.* ¶ 31.)

Plaintiffs allege that, apart from Plaintiffs, Sylvester coerced at least three VOPD personnel to resign. (*Id.* ¶ 33.) First, VOPD officer Marvese Renalls, a Hispanic woman who was discriminated against by Sylvester, was "coerced by Sylvester into resigning [in 2021] to escape the abuse," and later filed an EEOC charge against Sylvester. (*Id.*) Second, VOPD officer Andrew Pavone resigned in 2021 after Sylvester served him with disciplinary charges and placed him on leave pending an investigation by the district attorney ("D.A."), which was later closed for lack of merit. (*Id.*) After Sylvester learned that Pavone "intended to seek part-time employment with another police department," Sylvester "successfully petitioned New York State to decertify Pavone as a police officer" and "also successfully terminated Pavone's medical benefits." (*Id.*) Third, in April 2022, Sylvester served VOPD detective Edward Walker with

disciplinary charges and placed him on administrative leave, later "requir[ing] [Walker] to sign an irrevocable letter of resignation" that would become effective in December 2024. (*Id.*) Upon information and belief, Plaintiffs allege that Sylvester "bolstered" the disciplinary charges against Walker (who is Black) by discriminatorily using License Plate Recognition ("LPR") to "track Walker's license plate without a good-faith law-enforcement justification." (*Id.*)

Plaintiffs further allege that, over the course of Sylvester's time as chief, "at least three complaints accusing Sylvester of discrimination or harassment" were filed by VOPD officers with the Village, "at least six similar union grievances were lodged against [Sylvester]" with the local Police Benevolent Association ("PBA"), (*id.* ¶ 32), and that various Village officials— including Kahan and members of the Board—were "aware of the numerous and serious complaints about Sylvester's abusive behavior" and did nothing to stop it, (*id.* ¶ 10). Indeed, in September 2023, after the EEOC determined "there was reasonable cause to believe that Renalls suffered discrimination and retaliation based on race, gender, and national origin," (*id.* ¶ 33; *see also* SAC Ex. B (Dkt. No. 44)), Kahan informed the press "that the Village disagreed with the EEOC's finding" and would not cooperate with the EEOC's mediation process, (*id.* ¶ 11).

Sylvester also allegedly began a sexual relationship with Hirshowitz after he hired her as a VOPD officer in May 2016. (*Id.* ¶ 36.) Hirshowitz informed Rinaldi and others of her relationship with Sylvester, (*id.*), the couple was "observed on numerous occasions meeting in the outdoor parking lot of Hirshowitz's apartment building," (*id.* ¶ 40), and, on another occasion, "an elderly building custodian observed [Sylvester and Hirshowitz] having intimate relations" in the VOPD gym, (*id.* ¶ 39).

On December 6, 2023, Sylvester announced his "separation" from the VOPD. (*Id.* ¶¶ 3, 161.) The Board "unanimously approved" a confidential separation agreement for Sylvester,

which "awarded him over $160,000 . . . 'as a way of amicably resolving all matters related to [his] retirement.'" (*Id.* ¶¶ 3–4 (quoting SAC Ex. A (Dkt. No. 43)), ¶¶ 163–64.)  The separation agreement, which was publicly released in January 2024, (*id.* ¶ 163), required "Sylvester's unconditional and irrevocable resignation" as well as his "reasonabl[e] cooperat[ion] in good faith with the Village . . . on pending and future litigation relating to [discrimination claims against the Village] pertaining to Sylvester's employment," (*id.* ¶¶ 4, 164–65).  After Sylvester announced his resignation, multiple Village officials praised his leadership, innovations, and accomplishments.  (*See* ¶¶ 5, 12–13.)

### 3.  Rinaldi

During his employment with the VOPD, Rinaldi "never received negative evaluations" but instead, "received glowing recommendations from his direct supervisors and other VOPD superiors."  (*Id.* ¶ 41.)  However, in June 2018, Sylvester personally came to Rinaldi's home, informing Rinaldi that Sylvester and "Village officials believed Rinaldi needed treatment for a substance abuse problem."  (*Id.* ¶ 43.)  Sylvester "ordered Rinaldi to report promptly" to an inpatient treatment facility.  (*Id.*)  Despite not having a substance abuse problem, nor having recently taken a drug test or tested positive for drug use, Rinaldi complied as he was "afraid for his job."  (*Id.* ¶ 45.)  On June 14, 2018, Rinaldi was discharged from the inpatient facility and informed by a caretaker there that the caretaker "did not believe that [Rinaldi] required treatment."  (*Id.* ¶ 46.)  Sylvester confronted Rinaldi that same day, insisting that Rinaldi still required treatment and warning Rinaldi that, if he did not re-enter an inpatient drug treatment facility, Sylvester would bring disciplinary charges against him and have him fired.  (*Id.* ¶ 47.)  When Rinaldi refused, Sylvester placed him on administrative leave and later suspended him.  (*Id.* ¶ 48.)

On June 18, 2018, "[c]oerced by Sylvester, and as a condition for keeping his job," Rinaldi agreed to enter a different in-patient treatment facility the following week. (*Id.* ¶ 49.) Sylvester accordingly lifted Rinaldi's suspension and had him reinstated to "modified duty." (*Id.* ¶ 50.)[3] Rinaldi completed the treatment program a month later. (*Id.* ¶ 51.) At no point did Sylvester require Rinaldi to take a drug test, and at no point did Rinaldi have a positive drug test at the in-patient facilities he was forced to attend. (*Id.* ¶ 52.)

In November 2018 and June 2019, Sylvester issued Rinaldi "'chronic sick' warning letters," taking issue with Rinaldi's attendance. (*Id.* ¶ 53.) Sylvester did so despite that he "had no prior practice of issuing such letters," "other VOPD officers had taken many more sick days than Rinaldi yet did not receive warning letters," and Rinaldi, through the PBA, was "contractually entitled to use sick time 'as needed.'" (*Id.*) The "chronic sick" list was later discontinued after Rinaldi's resignation. (*Id.* ¶ 54.)

On January 9, 2021, VOPD officers responded to Rinaldi's home after he and his fiancé, Courtney Burns ("Burns") had a "domestic dispute." (*Id.* ¶ 55.) A few days later, Sylvester tried to schedule a videoconference with Burns and a Village attorney, and a few weeks after that, left Burns a voicemail, "trying to get her to 'cooperate' against Rinaldi." (*Id.* ¶ 56.) On February 9, 2021, Sylvester served Rinaldi with disciplinary charges relating to the January 9, 2021, incident, and the Village suspended Rinaldi without pay. (*Id.* ¶ 57.) The following month, the Village notified Rinaldi that it would no longer pay for his medical insurance, a determination that the PBA unsuccessfully attempted to contest. (*Id.* ¶ 58.)

---

[3] Plaintiffs allege that their collective bargaining agreement ("CBA") "did not contain any designation or definition for 'modified duty,'" and thus, Sylvester's use of that status "violated the terms of the CBA contract." (*Id.* ¶¶ 50, 103.)

On March 18, 2021, after Sylvester conditioned Rinaldi's return to work on him seeing a substance abuse counselor, Rinaldi was evaluated by a certified provider for his purported alcohol abuse. (*Id.* ¶ 59.) Although the provider determined that Rinaldi had "No Apparent Alcohol Problem," Sylvester "was not satisfied by the . . . evaluation." (*Id.*) The following month, although Plaintiffs allege Sylvester's accusation "was a sham," Rinaldi "settled his disciplinary charges with the Village by agreeing to participate in a substance abuse treatment program," because he "believed that he had no choice but to attend another program if he wanted to keep his job." (*Id.* ¶ 60.) From April 21, 2021, to June 16, 2021, Rinaldi completed an eight-week outpatient treatment program, during which time he never tested positive "for non-prescribed substances or alcohol." (*Id.* ¶ 61.)

On November 12, 2021, the VOPD responded to a "second domestic dispute at home" between Rinaldi and Burns. (*Id.* ¶ 62.) Although Plaintiffs allege that "*Burns* hit Rinaldi on the head with a harmful object," VOPD did not arrest Burns. (*Id.* (emphasis in original).) That same day, Sylvester asked Burns to make a statement against Rinaldi, allegedly stating "I know [Rinaldi] claims he's the victim, but I'm not buying it." (*Id.*)

On November 16, 2021, Rinaldi filed a harassment complaint against Sylvester with the Village, which only "ignited even greater retaliation by Sylvester." (*Id.* ¶ 63.) Later that month, on November 23, 2021, Burns filed a petition against Rinaldi in Family Court regarding a child custody dispute between them; that same day, Sylvester personally served Rinaldi at home with an order issued by the Family Court. (*Id.* ¶¶ 64–65.) Over the course of the next four months, Sylvester "hounded Burns to gather evidence and information against Rinaldi," leading Burns to believe that she would lose her children if she did not cooperate with Sylvester. (*Id.* ¶ 65.)

8

On December 1, 2021, Sylvester informed Rinaldi that he was the "potential subject of disciplinary action in connection with certain matters that ha[d] come to the attention of the Village." (*Id.* ¶ 66.) Rinaldi was placed on administrative leave effective immediately. (*Id.*) On December 7, 2021, Karen D'Attore, the Village Manager ("D'Attore"), served Rinaldi with disciplinary charges relating to the November 12, 2021 domestic dispute and to "unsupported and untrue allegations of drug use by Rinaldi." (*Id.* ¶ 67.) Plaintiff alleges that D'Attore "issued those charges at the behest of Sylvester, despite her lacking any authority under the Village charter to do so." (*Id.* ¶ 68.) The following day, D'Attore notified Rinaldi that he was suspended without pay, and later served Rinaldi with "multiple versions of amended disciplinary charges." (*Id.* ¶¶ 69–71.) After a second set of amended charges were issued on March 6, 2022, Burns "repeatedly wrote to the Village to retract her allegations against Rinaldi," but "[h]er letters were ignored." (*Id.* ¶ 71.)

In April 2022,[4] Sylvester allegedly began an investigation into "anonymous and [threatening] text messages that Hirshowitz was supposedly receiving on her mobile telephone." (*Id.* ¶ 72.) During the investigation, Sylvester asked multiple VOPD personnel "if they knew whether Rinaldi had sent the messages—clearly indicting that he believed Rinaldi was guilty." (*Id.* ¶ 73.) When a PBA lawyer informed Rinaldi how Sylvester "was publicly and falsely implicating him in criminal activity," Rinaldi determined he "could not bear any more harassment." (*Id.*)

Because he "fear[ed] additional disciplinary charges and perhaps worse if he did not resign," on April 25, 2022, Rinaldi settled his disciplinary charges by admitting to a "technical

---

[4] The SAC here states that the investigation began in April 2021, (*see id.* ¶ 72), but later states it was begun in April 2022, (*id.* ¶ 90). The Court uses the later date as it appears to more closely align with the full narrative presented.

violation of the VOPD manual, which requires officers to always conduct themselves in a professional manner." (*Id.* ¶ 74; SAC Ex. 3 ("Rinaldi Agreement") (Dkt. No. 49-3).) In exchange, the Village dismissed all other disciplinary charges against him. (*Id.* ¶ 74.)

Rinaldi was "represented by counsel of his own choosing" in connection with the settlement between him and the Village. (Rinaldi Agreement 3.) In signing the settlement, Rinaldi affirmed it was "entered into freely, knowingly and openly without coercion or duress" and upon consultation with his attorney "concerning the terms and ramifications of th[e] Agreement." (*Id.* ¶ 17.) The Agreement provides that, although Rinaldi "understands and has been advised that . . . he has a right to a hearing," (*id.* ¶ 8), by signing Rinaldi "waives his right to a hearing pursuant to the CBA, [Section 5711-q of the Unconsolidated Laws of New York (the "Act")], or any other agreement, law, regulation and/or statute, on the conduct/violation . . . and/or the Charges preferred against him," and further, "waives any rights to make a claim pursuant to the Act, Civil Service Law, the CBA, or other agreement," (*id.* ¶¶ 2, 5). It further provides that Rinaldi "agrees to forever release and discharge the Village, its Mayor, its Board of Trustees, its Chief of Police, its Village Manager, and all its officers, directors, employees, and/or agents, from any and all liabilities arising directly or indirectly out of his employment with the Village[,] . . . including but not limited to any claims asserted and/or non-asserted he may have under any Federal, State or local statute, regulation, rule, ordinance, or order . . . ." (*Id.* ¶ 9.)

Additionally, because Rinaldi was afraid that the disciplinary charges would have, if revealed, prevented him from securing future employment, (SAC ¶ 78), he "demanded" that the Agreement contain a confidentiality provision ("Confidentiality Provision"), (*id.* ¶ 77), which provides that:

> [t]he existence, terms and conditions of this Agreement are and shall be confidential and shall not be disclosed by the Village, Officer Rinaldi or his attorneys to any person or entity, except to enforce any of the terms of this Agreement or pursuant to a subpoena, upon a demand of a federal or state agency or as required by law. If a demand for such information is made, and the Village believes it is obligated to provide such information, it will notify Rinaldi's attorney and/or chosen representative of its intent to disclose same.

(Rinaldi Agreement ¶ 13.) Rinaldi alleges that "[h]e would not have settled the disciplinary charges without the Confidentiality Provision" but instead, would have "challeng[ed] any adverse disciplinary finding by the Village." (SAC ¶ 78.)

Plaintiffs allege that Sylvester "never intended to comply with the Confidentiality Provision," and informed VOPD personnel that "he was not bound" by the Agreement because "he didn't sign it and the [V]illage board was not his boss." (*Id.* ¶ 79.) Plaintiffs further allege that, despite the Confidentiality Provision, "Sylvester intended to disclose the disciplinary charges against Rinaldi to the press" before the Agreement was even signed. (*Id*. ¶ 80.)

On May 10, 2022—because he knew "he could not possibly stay at the VOPD any longer" due to Sylvester's harassment about the text messages—Rinaldi resigned from the VOPD and accepted a transfer position with the Greenburgh Police Department. (*Id.* ¶ 76.) Sylvester learned of Rinaldi's new job offer on the day of Rinaldi's resignation. (*Id.* ¶ 81.) Plaintiffs allege that, on that same day, Sylvester reached out to a local news station where Sylvester had several friends (News 12) and disclosed to a reporter there "Rinaldi's settlement with the Village, the nature of the disciplinary charges against him (including drug use), and that Rinaldi was intending to work for the Greenburgh Police Department." (*Id.* ¶¶ 80–81.) At some point after this disclosure, a News 12 reporter allegedly contacted the Greenburgh Town Board to inform them they were hiring a "rogue cop," and as a result, the Greenburgh Police Department rescinded Rinaldi's job offer in May 2022. (*Id.* ¶ 82.)

11

At some unidentified time later, News 12 apparently served a Freedom of Information Law ("FOIL") request on the Village regarding Rinaldi. (*See id.* ¶¶ 82–83.) Kahan, on behalf of the Village, provided News 12 with documentation regarding Rinaldi, but "failed to redact information that is legally barred from disclosure," including myriad personal and identifying details as well as "information related to the substance abuse programs he was forced to attend." (*Id.* ¶ 83.) Plaintiffs allege that these "improper disclosures" were done intentionally "to help Sylvester block Rinaldi from getting another police job." (*Id.*)

Plaintiffs allege that Sylvester continued to violate the Confidentiality Provision by informing other Westchester County police chiefs about Rinaldi's purported drug use and "sending them Rinaldi's disciplinary charges." (*Id.* ¶ 85.) Despite applying to numerous law enforcement agencies in Westchester County, Rinaldi received no responses and remains unemployed to date. (*Id.* ¶ 86.) Indeed, when approached about hiring Rinaldi, multiple police executives allegedly stated they could not "touch this" and "would not even consider him for hire." (*Id.* ¶ 87.)

Despite Rinaldi's departure from the VOPD, "Sylvester conspired with Hirshowitz to file manufactured criminal charges against Rinaldi" and "to fabricate evidence of [Rinaldi's] criminal conduct." (*Id.* ¶ 92.) On May 4, 2022, "at the behest of" Sylvester, Hirshowitz submitted a complaint to the D.A. about the harassing text messages she was receiving, stating that "a fellow police offer or multiple officers at [the VOPD] are involved." (*Id.* ¶ 93.) After the D.A. opened an investigation into these allegations, Sylvester lodged his own complaint with the D.A., "directly accusing Rinaldi as the source of the texts." (*Id.* ¶ 94.) Further, at a VOPD department-wide meeting on August 23, 2022, Sylvester "led VOPD personnel to believe that Rinaldi was sending Hirshowitz 'disturbing texts.'" (*Id.* ¶ 97.)

On June 28, 2023, Hirshowitz was arraigned in criminal court on seven criminal charges in connection with her alleged "use of fake emails to file a maliciously false complaint with the D.A." (*Id.* ¶ 95; *see* SAC Ex. C (Dkt. No. 45).)  In response, Sylvester allegedly told Village officials that Hirshowitz "had been set up by Rinaldi and Zambrano," and recommended that Hirshowitz not be suspended without pay.  (*Id.* ¶ 96.)  Plaintiffs allege that, despite the pending criminal charges (three of which are felonies), Hirshowitz "continues to be on the Village's payroll" and has not had disciplinary charges brought against her.  (*Id.* ¶¶ 95–96, 98.)

### 4. Zambrano

On March 18, 2019, Zambrano—a "highly respected police officer"—fractured a finger on her dominant and shooting hand while off-duty.  (*Id.* ¶ 100.)  Zambrano's physician placed her in a cast and gave her a letter stating she could not return to work until April 13, 2019.  (*Id.*)  On March 22, 2019, Sylvester emailed Zambrano, "*ordering*" her to complete and return a modified duty questionnaire within a week, despite merely "*request[ing]*" that white VOPD officers complete the form in similar situations.  (*Id.* ¶ 101 (emphasis in original).)  "Within minutes" of Zambrano receiving the email, and at Sylvester's direction, a VOPD captain hand-delivered a letter to Zambrano's home reiterating the same order.  (*Id.* ¶ 102.)

On March 29, 2019, Zambrano provided the completed form as "she believed it was required to keep her job."  (*Id.* ¶ 103.)  That same day, Sylvester emailed Zambrano and ordered her back to work on April 1, 2019, on "modified duty."  (*Id.*)  Again, within minutes of Zambrano receiving the email, VOPD Lieutenant Dan Slater ("Slater") hand-delivered the same directive to Zambrano's residence.  (*Id.* ¶ 105.)  Because the VOPD had no prior practice of hand-delivering letters to patrol officers, Plaintiffs allege Sylvester only did so to "intimidate and harass Zambrano."  (*Id.* ¶¶ 103, 105.)

Zambrano returned to work as ordered on April 1, 2019. (*Id.* ¶ 106.) After reporting to work, she requested and received authorization to go home sick. (*Id.* ¶ 107.) Once Zambrano had left, Sylvester questioned the authorizing officer about the details of Zambrano's ailment, despite the VOPD having no practice of doing so, and despite the terms of the PBA outlining that supervisors could only request medical notes when inquiring about medical-related absences. (*Id.*)

The following day, Zambrano called in sick to work and was treated at an urgent care facility. (*Id.* ¶ 108.) The day after, Slater called Zambrano to remind her she needed a sick note for her absence. (*Id.* ¶ 109.) He then followed the call with an email reminding her to produce a medical note. (*Id.*) Plaintiffs allege that he did so at the direction of Sylvester, who "intended to intimate and harass Zambrano." (*See id.*)

On April 5, 2019, Zambrano filed a complaint against Sylvester with the Village personnel department, stating that Sylvester "discriminated against her on matters involving secondary employment, scheduling, and sick leave," and alleging that Sylvester was "treating her differently and more harshly than other VOPD officers because . . . she was one of only two female Hispanic officers." (*Id.* ¶ 110.) Zambrano also informed the Village she was concerned the Village would not investigate the complaint impartially, "since Sylvester often expressed openly to VOPD personnel that he maintain[ed] a close personal and influential relationship with the Trustees." (*See id.* ¶ 111.) Kahan contacted Zambrano on April 8, 2019, regarding her complaint and, in response to Zambrano's concerns about impartiality, stated that the Trustees might "opt to have a person from an 'outside agency' conduct the investigation." (*Id.* ¶ 112.) However, when Kahan met with Zambrano again two days later, he informed her while the

Trustees "initially agreed" to an outside party, they had instead "directed Kahan to conduct the investigation himself." (*Id.* ¶ 113.)

The Trustees interviewed Zambrano about the matter at "the very tail end" of their May 8, 2019 meeting, and later interviewed Sylvester and Slater on different days. (*Id.* ¶ 114.) Slater "claimed to have little direct knowledge" of Zambrano's allegations. (*Id.*) The Trustees did not interview Zambrano's direct supervisor or any of her patrol-officer colleagues. (*Id.* ¶ 115.) On June 13, 2019, Kahan informed Zambrano "by letter that the Village concluded that her complaint was unfounded and would take no further action on it." (*Id.* ¶ 116.) Plaintiffs further allege that, between April 5 and June 13, 2019, Sylvester told several VOPD employees about his "frustration over incurring 'out-of-pocket' legal expenses in defending himself against Zambrano's harassment claim." (*Id.* ¶ 117.) A few months later, Zambrano asked to switch her shift to the midnight tour "to minimize contact with Sylvester." (*Id.* ¶ 118.)

On October 7, 2019, "ramp[ing] up his retaliatory efforts," Sylvester issued Zambrano a "chronic sick" warning letter advising Zambrano that she had used an "excessive" number of sick days and informing her that she was thus not allowed "to accept voluntary overtime or work secondary employment outside of the VOPD" for at least six months. (*Id.* ¶ 121.) Plaintiffs allege that these work restrictions were retaliatorily imposed to "reduce [Zambrano's] financial income." (*Id.*) A few days later, on October 13, 2019, although Slater had approved Zambrano's request to use "holiday" leave for paid time off, Sylvester overruled Slater, denied the request, and directed Slater to order Zambrano to "call in sick" instead. (*Id.* ¶¶ 124–25.) Zambrano called in sick because she believed she had to in order to keep her job. (*Id.* ¶ 125.)

On October 17, 2019, after Sylvester ordered Zambrano to terminate her second job, Zambrano went to Hastings High School, her place of secondary employment, to retrieve her

belongings and return her identification and keys.  (*Id.* ¶ 126.)  School personnel told her that "an unidentified member of the VOPD had repeatedly contacted the school, requesting documents regarding her work schedule and secondary employment status."  (*Id.*)  Plaintiffs allege that the VOPD did not have a prior practice "of contacting places of secondary employment for any other patrol officers."  (*Id.* ¶ 127.)

The next day, Sylvester called Zambrano into VOPD headquarters and ordered her to go to Albany to undergo a "fitness for duty" psychological evaluation.  (*Id.* ¶ 128.)  Sylvester also ordered Zambrano to sign a Health Insurance Portability and Accountability Act ("HIPAA") release form so that Sylvester—and the provider he chose to complete Zambrano's evaluation— could request all of Zambrano's medical records.  (*Id.* ¶ 129.)  Zambrano complied because she believed it necessary to keep her job.  (*Id.*)  Plaintiffs allege that the VOPD did not have a prior practice of ordering officers to complete HIPAA release forms for duty evaluations, and further, that the only other officer ordered to complete such a form and undergo a psychological evaluation was Rennals, the only other female Hispanic officer on the VOPD.  (*Id.* ¶¶ 129–31.) Although Zambrano filed a grievance related to releasing her medical records, the Village upheld Sylvester's HIPAA directive.  (*Id.* ¶ 132.)  A few months later, immediately prior to an administrative hearing on the matter, the Village rescinded Sylvester's order.  (*Id.* ¶ 133.) However, Zambrano's medical records had already been requested and released.  (*Id.*)

On November 11, 2019, Zambrano delivered Family Medical Leave Act paperwork to the Village's personnel director, requesting to use paid time off to assist her mother, who was "suffering from a deteriorating health condition."  (*Id.* ¶ 134.)  Sylvester argued with the personnel director about the request and, "on that same day and unbeknownst to Zambrano," directed VOPD personnel to "continuously and unlawfully" surveil Zambrano's personal

vehicles through LPR. (*Id.* ¶ 135.) New York's LPR system "can track a vehicle's location through the state" and helps law enforcement "pinpoint the vehicle's specific whereabouts at a specific time and [] identify travel patterns." (*Id.*) Without "any good-faith law-enforcement justification," Sylvester directed this surveillance "for a continuous period exceeding two and one-half years," resulting in the "VOPD collect[ing] surveillance reports on Zambrano's cars at least 111 times." (*Id.* ¶ 136 (emphasis omitted).)

Plaintiffs allege that, as early as mid-November 2019, Sylvester and Kahan discussed suspending and terminating her without pay, despite Kahan not even asking to review evidence in support of Sylvester's allegations at that time. (*Id.* ¶ 137.) On November 24, 2019, the psychological evaluator chosen by Sylvester submitted a report stating that Zambrano was "unfit for duty as police officer." (*Id.* ¶ 138.) Eleven days later, on December 5, 2019, Zambrano was ordered to appear at VOPD headquarters and was placed on involuntary leave of absence effective immediately. (*Id.* ¶ 139.) On December 6, 2019, Zambrano's attorney informed the Village that Zambrano was only accepting the involuntary leave "because it was part of Sylvester's ongoing harassment." (*Id.* ¶ 140.) After undergoing a second, independent psychological examination, Zambrano was cleared for full duty and returned to work on January 8, 2020. (*Id.* ¶ 142.)

Later that month, on January 28, 2020, "Sylvester personally went to Zambrano's home" and taped a letter to her front door, ordering her to appear on February 6, 2020, for questioning. (*Id.* ¶ 142.) Zambrano was accordingly questioned "at a disciplinary interview" on that date by Sylvester and an attorney retained by the Village. (*Id.* ¶ 143.) On March 27, 2020, Zambrano was placed on administrative leave, and on April 1, 2020, Sylvester served Zambrano with

disciplinary charges relating to her work for her secondary employer and the Village suspended her without pay.  (*Id.* ¶¶ 144–46.)[5]

During Zambrano's suspension, on April 17, 2020 and May 6, 2020, Sylvester twice accessed the LPR system to track the whereabouts of Zambrano's vehicle without any "justifiable basis for doing so."  (*Id.* ¶ 148.)  Additionally, during this time, Sylvester "openly and falsely stated to VOPD personnel and Village officials" that Zambrano had sent harassing communications to Hirshowitz and the Village.  (*Id.* ¶ 149.)

Based on this ongoing harassment, Zambrano "reasonably concluded that she could not remain at the VOPD."  (*Id.*)  Accordingly, on July 8, 2020, Zambrano settled her disciplinary charges, signed a confidential separation agreement and general release of claims with the Village, and resigned from the VOPD.  (*Id.* ¶¶ 150, 153; *see* SAC Ex. 4 ("Zambrano Agreement") (Dkt. 49-4).)  Zambrano did so "only because she believed that the Westchester County Department of Public Safety had accepted her as a transfer candidate."  (SAC ¶ 153.)[6]

In signing the Agreement, Zambrano affirmed she "act[ed] voluntarily and of [her] own free will," and was "fully and fairly represented by counsel" prior to signing the Agreement. (Zambrano Agreement ¶ 6(a)–(b)).)  The Agreement provides that, in exchange for receiving severance payments, Zambrano "completely and irrevocably release[s] all claims, obligations,

---

[5] Plaintiffs allege that two VOPD officers recommended that Sylvester not file disciplinary charges against Zambrano because "there was insufficient evidence" to support them.  (*Id.* ¶ 147.)  Plaintiffs also allege that the PBA "sharply protested" the VOPD and the Trustees' decision to "'suspend an officer and deprive her of her pay during [the COVID-19] pandemic' based on 'unproven allegations[,]'" describing the decision as "'grossly disproportionate' to the 'technical infraction'" Zambrano was charged with—i.e., "working too much for another employer."  (*Id.* ¶ 146 (quoting SAC Ex. D (Dkt. No. 46)).)

[6] Zambrano began pursuing transfer opportunities starting in November 2019, after Sylvester ordered her to undergo a psychological evaluation.  (*Id.* ¶ 154.)

causes of action and demands which [she] ha[s] or ever had," up until the date of signing,

"against the Village . . . and all of its present and/or former mayors, trustees, officer, managers,

supervisors, employees, agents, representatives, attorneys, and employee benefit plans or funds. .

. ." (*Id.* ¶ 3(a).)

The Agreement also contains a disclosure limitation, mandating that "if a prospective

employer contacts the Village regarding [Zambrano's] potential employment, consistent with its'

[sic] practice the Village will provide the prospective employer with salary information and dates

of employment only." (*Id.* ¶ 5(b) ("Disclosure Limitation").) Zambrano alleges she "would not

have agreed to settle her disciplinary charges without the Disclosure Limitation," as she feared

that Sylvester "would otherwise continue to harass and retaliate against her by communicating

disciplinary-related information to prospective employers to stop them from hiring her." (SAC

¶ 151.)

However, Plaintiffs allege that Sylvester never intended to comply with the Disclosure

Limitation. (*Id.* ¶ 152.) Instead, when he learned of Zambrano's transfer, he "promptly breached

the Disclosure Limitation and derailed that specific employment opportunity and others,"

disparaging Zambrano to Westchester County police chiefs in response to their inquiries about

Zambrano's applications. (*Id.* ¶ 155.) To date, Zambrano has not secured another law-

enforcement job. (*Id.*)

On November 21, 2022, Zambrano submitted multiple FOIL requests to the Village for

documents, including her VOPD personnel file, seeking to determine what materials VOPD had

sent to prospective employers after her resignation. (*Id.* ¶ 156.) In response, Kahan repeatedly

informed Zambrano that they needed more time to produce the requested documents and to date

has not fully complied with the FOIL requests. (*Id.* ¶¶ 156–59.)

B. Procedural History

Plaintiffs filed their Complaint on July 6, 2023, in New York Supreme Court, Westchester County, asserting state law claims against Defendants. (*See* Dkt. No. 1 ¶ 1.) On September 6, 2023, in response to a motion to dismiss by Defendants, Plaintiffs filed an Amended Complaint, again asserting only state law claims. (*Id.* ¶ 2.) On January 9, 2024, Plaintiffs sought leave from the state court to file a second amended complaint, asserting causes of action under 42 U.S.C. § 1983 as well as state law. (*See id.* ¶ 3.) Three days later, Defendants filed a Notice of Removal to this Court. (*See generally* Dkt. No. 1.)

After a status conference and conflicting letter motions about briefing schedules for Plaintiffs' putative Motion to Amend, (*see* Dkt. Nos. 7–21), the Parties filed a joint stipulation on July 8, 2024, allowing Plaintiffs to file their SAC, (*see* Dkt. Nos. 23–26). The SAC was filed on July 19, 2024. (*See* Dkt. No. 32.) Following a status conference the same day, the Court adopted a briefing schedule on Defendants' Motion to Dismiss. (*See* Dkt. (Minute Entry for July 19, 2024); Dkt. No. 31.)

Pursuant to that schedule, on September 3, 2024, Defendants submitted their Motion and accompanying papers. (*See* Not. of Mot.; Sokoloff Decl.; Defendants' Mem. in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 40).) After requesting and receiving permission to file exhibits to the SAC, (Dkt. Nos. 41–42), Plaintiffs filed four exhibits on October 14, 2024, (*see* Dkt. Nos. 43–46). On October 21, 2024, after receiving permission to file excess pages, (*see* Dkt. Nos. 47–48), Plaintiffs filed their Opposition and accompanying papers, (*see* Plaintiffs' Mem. in Opp'n to Mot. ("Pls' Opp'n") (Dkt. No. 50); Alter Decl.). Defendants requested an extension of time to file their Reply and, upon receiving said extension, filed their Reply on November 13, 2024. (*See* Nos. 51–52; Reply in Supp. of Mot. ("Reply") (Dkt. No. 53).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior

era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

The SAC raises eleven claims arising under federal and New York law. (SAC ¶¶ 168–254.) With respect to the federal constitutional claims, Plaintiffs allege that: they were deprived of due process when they were coerced into resigning their employment, (*id.* ¶¶ 168–79, 207–19); Rinaldi was denied due process when he was slandered in connection with his resignation, (*id.* ¶¶ 180–86); Zambrano was denied equal protection of the law on account of her gender and race, (*id.* ¶¶ 220–28); and Zambrano was deprived of her Fourth Amendment right against unreasonable warrantless searches, (*id.* ¶¶ 229–38). With respect to the claims arising under New York law, Plaintiffs allege that they suffered: fraud in the inducement, (*id.* ¶¶ 187–94, 239–45); breach of contract, (*id.* ¶¶ 195–200, 246–49); and tortious interference with prospective business relations, (*id.* ¶¶ 201–06, 250–54).

In support of their Motion, Defendants assert that all of Plaintiffs' claims are barred by their settlements with the Village. (*See* Defs' Mem. 15–20.) Alternatively, they argue that Plaintiffs have failed to plead any federal claims against the Individual Defendants, have failed to state a *Monell* claim against the Village, and have failed to plead any state claims. (*See* Defs' Mem. 21–26, 28–33.) Finally, Defendants ask the Court to strike the "scandalous matter" asserted in the SAC, pursuant to Federal Rule of Civil Procedure 12(f). (*See* Defs' Mem. 27–28.)

The Court addresses Defendants' arguments only as necessary to resolve the instant Motion.

### 1. The Effect of the Settlements

First, Defendants argue that both Plaintiffs released and waived all claims against the Village and its employees when they settled their disciplinary charges and are thus barred from bringing the instant lawsuit. (Defs' Mem. 15–20.) In opposition, Plaintiffs assert that they were released from their contractual obligations by virtue of Defendants' material breach. (*See* Pls' Opp. 8–11.)

"It is well established that a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Great Lakes Reinsurance (UK) SE v. Herzig*, 764 F. Supp. 3d 164, 183 (S.D.N.Y. 2025); *see also Genao v. Ruiz*, No. 24-CV-2077, 2025 WL 219160, at *4 (S.D.N.Y. Jan. 16, 2025) ("Under New York law, a valid release constitutes a 'complete bar to an action on a claim which is the subject of the release.'" (quoting *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011))). However, it is also well established that, "[u]nder New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under

the contract." *Body Glove IP Holdings, LP v. Exist, Inc.*, No. 21-CV-01181, 2023 WL 3568955, at *10 (S.D.N.Y. May 17, 2023) (citing *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003)); *see also Norris v. Goldner*, No. 19-CV-5491, 2023 WL 5477229, at *13 (S.D.N.Y. Aug. 24, 2023) ("A party may unilaterally terminate a contract where the other party has breached and the breach is material." (quoting *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 195 (S.D.N.Y. 1990))).

The Court concludes that Plaintiffs have adequately alleged that Defendants breached both settlement agreements by violating the confidentiality provisions contained therein.  First, although the Rinaldi Agreement prohibited the disclosure of "the existence, terms, and conditions of this Agreement," except to enforce the Agreement, as required by law, or pursuant to a valid subpoena, (Rinaldi Agreement ¶ 13; SAC ¶ 77), "Sylvester disclosed to the News 12 reporter *Rinaldi's settlement with the Village*, the nature of the disciplinary charges against him . . . and that Rinaldi was intending to work for the Greenburgh Police Department," (SAC ¶ 81 (emphasis added)).  Second, although the Zambrano Agreement provided that, "if a prospective employer contact[ed] the Village regarding [Zambrano's] potential employment, consistent with its' [sic] practice the Village will provide the prospective employer with salary information and dates of employment only," (*id.* ¶ 151; Zambrano Agreement ¶ 5(b)), Sylvester allegedly "disparaged Zambrano as a police officer" when receiving "inquiries regarding [her] job applications," and "disclosed information about Zambrano's dismissed disciplinary charges," (SAC ¶¶ 155, 247).  These allegations are plainly sufficient to plead breach.  *Cf. Shoppertrak RCT Corp. v. Barnes & Noble, Inc.*, No. 20-CV-3814, 2021 WL 517819, at *2 (S.D.N.Y. Feb. 10, 2021) (denying motion to dismiss breach of contract claim where the plaintiff pled that specific provisions were breached).

The question, then, is whether these breaches were material such that Plaintiffs' performance under the contract is no longer required. Plaintiffs allege that these provisions were the only reason they entered into the agreements in the first place. (*See* SAC ¶¶ 78, 151.) However, whether a breach is material—i.e., whether "the breach goes to the root of the contract"—is generally a question of fact for a jury to decide. *See Video Elephant Ltd. v. Blake Broad. LLC*, No. 21-CV-0503, 2024 WL 68525, at *5 (S.D.N.Y. Jan. 5, 2024) (citing first *In re Lavigne*, 114 F.3d 379, 388 (2d Cir. 1997), then *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d. Cir. 2015)); *see also Travelers Cas. Ins. Co. of Am. v. BRB Constr. Corp.*, No. 22-CV-5496, 2024 WL 3952729, at *5 (S.D.N.Y. Aug. 27, 2024) ("Generally, materiality is a question of fact for the jury."); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-CV-7372, 2019 WL 13414324, at *9 (S.D.N.Y. Sept. 10, 2019) ("The issue of materiality is generally a question of fact for the jury." (quoting *Parmar v. Hermitage Ins. Co.*, 800 N.Y.S.2D 726, 728 (N.Y. App. Div. 2005))). Accordingly, the question of whether Defendants materially breached the contract—which would free Plaintiffs from their obligations under the releases—cannot be decided on a motion to dismiss. *See Gravitas Search Partners LLC v. Deutsch*, No. 24-CV-02683, 2025 WL 2243720, at *10 (S.D.N.Y. Aug. 6, 2025) (denying the defendants' motion because a factual dispute relating to the alleged breach was "ultimately a question of fact that cannot be resolved on a motion to dismiss"); *cf. Mason v. Reed's Inc.*, 515 F. Supp. 3d 135, 146 (S.D.N.Y. 2021) (denying the defendants' motion because "[w]hether [contractual] warranties were breached is a question of fact that cannot be decided on a motion to dismiss").[7] The Court thus proceeds to address the merits of Plaintiffs' claims.

---

[7] Because the Court cannot determine material breach at this stage and will instead proceed to the merits, it need not address Plaintiffs' argument that they were fraudulently induced into signing the agreements. (*See* Pls' Opp. 11 n.1.)

2.  Section 1983 Claims

a.  Coerced Resignation Claims

Plaintiffs first allege that, due to Sylvester's constant harassment, they were "coerced [into] resigning their jobs" and thus, they were deprived without due process of their protectable property interests in their employment.  (*See id.* ¶¶ 170–79; 207–18.)

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law."  U.S. Const. amend. XIV § 1.  "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'"  *Polardo v. Adelberg*, No. 22-CV-2533, 2023 WL 2664612, at *11 (S.D.N.Y. Mar. 28, 2023) (quoting *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004)).  "In adjudicating due process claims, [courts] consider two distinct issues: 1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, 2) whether existing state procedures are constitutionally adequate."  *Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-CV-8870, 2024 WL 4817649, at *8 (S.D.N.Y. Nov. 18, 2024) (quoting *Ford Motor Credit Co. v. N.Y.C. Police Dep't*, 503 F.3d 186, 190 (2d Cir. 2007) (internal quotation marks omitted)); *Capul v. City of New York*, No. 19-CV-4313, 2020 WL 2748274, at *7 (S.D.N.Y. May 27, 2020) ("A procedural due process claim comprises two elements: (i) the existence of a property or liberty interest that was deprived; and (ii) deprivation of that interest without due process."), *aff'd*, 832 F. App'x 766 (2d Cir. 2021)

Here, Defendants rightly do not contest that Plaintiffs had property interests in their continued employment.  (*See generally* Defs' Mem.)  *See Barrer-Cohen v. Greenburgh Cent. Sch. Dist.*, No. 18-CV-1847, 2019 WL 3456679, at *7 (S.D.N.Y. July 30, 2019) ("It is well

settled that public employees who can be discharged only for cause, have a constitutionally protected property interest in their tenure."); *see also Sorano v. Taggart*, 642 F. Supp. 2d 45, 56 (S.D.N.Y. 2009) (noting "it [was] beyond argument that [a police officer] ha[d] a constitutionally protected property interest in her continued employment" and collecting cases). The question is thus whether the process afforded to Plaintiffs was constitutionally adequate.

In the Second Circuit, coerced resignation cases are typically evaluated under the standard set forth in *Giglio v. Dunn*, 732 F.2d 1133 (2d Cir. 1984). In *Giglio*, the district court found there was no due process violation where a plaintiff resigned from his tenured position as a high school principal and later sued, asserting his resignation was coerced. *Id.* at 1134. In affirming the judgment of the district court, the Second Circuit held that Giglo had failed to state a procedural due process violation because a pre-deprivation hearing would have been "not only impractical[,] but virtually impossible," and because Giglo had an adequate post-deprivation remedy under Article 78 of New York Civil Practice Law. *Id.* The Second Circuit explained that "[a] coerced resignation does not involve a showing of cause; it is simply the submission by an employee to pressure exerted by a superior," and thus, "[w]hen an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance." *Id.* at 1135. Accordingly, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter." *Id.*

As Defendants note, (*see* Defs' Mem. 21), *Gilgio* still applies to coerced resignation cases, *see Grant v. City of New York*, No. 19-CV-4334, 2020 WL 5440628, at *3 (S.D.N.Y. Sept. 10, 2020) ("*Giglio* remains good law in this Circuit."), *aff'd*, 850 F. App'x 113 (2d Cir. 2021); *see also Capul*, 2020 WL 2748274, at *9–10 (applying *Giglio* to a coerced resignation case and

collecting cases); *Fortunato v. Liebowitz*, No. 10-CV-02681, 2012 WL 6628028, at \*5 (S.D.N.Y. Dec. 20, 2012) (noting, on summary judgment, that "subsequent decisions have followed *Giglio* and held that the availability of a post-deprivation hearing in a case where a plaintiff alleges a coerced resignation satisfies the requirements of due process" and collecting cases).  Applying this standard, the Court concludes that Plaintiffs had adequate post-deprivation remedies.

Both Plaintiffs voluntarily left their employment and in so doing, signed agreements waiving their right to contest their pending disciplinary charges in an Article 78 hearing.  (*See* supra Sections I.A.3–4.)  As "[a] considerable line of Second Circuit precedent holds that the availability of a post-deprivation Article 78 proceeding satisfies a plaintiff's constitutional right to procedural due process," *Marraccini v. Belmont*, No. 19-CV-8458, 2020 WL 5505364, at \*9 (S.D.N.Y. Sept. 10, 2020), the Court cannot conclude that the process available to them was inadequate.  That Plaintiffs chose not to avail themselves of said process does not amount to a constitutional violation.  *See Grant*, 2020 WL 5440628, at \*3 (denying a due process claim where a police department employee voluntarily resigned and did not request an Article 78 hearing); *see also Capul*, 2020 WL 2748274, at \*5, 14 (denying due process claim where the resigning police officers "elected not to grieve their circumstances of their departures . . . through an Article 78 proceeding"); *Cole-Hatchard v. Hoehmann for Town of Clarkstown, N.Y.*, No. 16-CV-5900, 2017 WL 4155409, at \*7 (S.D.N.Y. Sept. 18, 2017) ("In New York, a police officer may bring an Article 78 proceeding to challenge the voluntariness of his resignation.  Plaintiff did not do so.  This renders implausible plaintiff's allegation that he was denied due process." (internal citations omitted)).

Plaintiffs do not contest the adequacy of the available Article 78 proceedings.  (*See* Pls' Opp. 12.)  However, they argue that *Giglio* is inapposite because "Plaintiffs did not simply fail to

avail themselves of available due process protections," but instead, that "Defendants tricked them into waiving those rights."  (*See id*.)  Specifically, the "trick," as alleged here, is that Plaintiffs were induced to settle their disciplinary charges because Defendants promised they would abide by the Confidentiality Provision and Disclosure Limitation, when in reality, Sylvester never intended to follow those provisions.  (*Id.* at 13; SAC ¶ 17.)

Plaintiffs' argument does not hold water.  It is of no moment, for purposes of this analysis, that Defendants allegedly breached the agreement or even that they intended to breach from its inception.  What matters is that Plaintiffs had adequate process available to them that they chose not to undergo.  Although Plaintiffs were allegedly motivated by receiving assurances of confidentiality in order to protect future employment opportunities, they both had the option of defending themselves against their disciplinary charges in an Article 78 hearing and possibly clear their names.  (*See* supra Sections I.A.3–4.)  Instead, while represented by counsel, both chose to waive that right.  (*Id.*)  Their inability to exercise it now does not nullify that waiver or render that process inadequate.  *See Barzilay v. City of New York*, 610 F. Supp. 3d 544, 611 (S.D.N.Y. 2022) ("The failure . . . to make use of an adequate post-deprivation remedy such as a grievance hearing . . . will defeat a procedural due process claim on the merits, even if the post-deprivation remedy is no longer available at the time of suit." (quoting *Hefferan v. Corda*, 498 F. App'x 86, 88 (2d Cir. 2012 (summary order))).[8]  In other words, Plaintiffs are not complaining of

---

[8] Plaintiffs' argument that their waiver was fraudulently obtained is similarly unavailing. Plaintiffs allege no facts suggesting that they did not understand the terms of their waivers or that they signed under duress.  Instead, they each affirmed, with the advice of counsel, that they knowingly and voluntarily waived their rights to address their grievances in a different forum. *See Henry v. Brzeski*, No. 21-CV-05682, 2023 WL 2021018, at *1 (E.D.N.Y. Feb. 15, 2023) (dismissing challenge to waiver where "[p]laintiff offer[ed] no basis to conclude that his waiver of potential civil claims was not done voluntarily, knowingly, and intelligently" (internal quotation marks omitted)); *Intermor v. Inc. Vill. of Malverne*, No. 03-CV-5164, 2007 WL

a lack of due process; they are quibbling with the lack of consideration they received. That is a contract claim, not a constitutional one.

Accordingly, Plaintiffs' coerced resignation claim must be dismissed.[9]

   b.  Stigma-Plus Claim

Next, Rinaldi alleges that his due process rights were violated when "Sylvester defamed [Rinaldi] to other VOPD personnel" in connection with Rinaldi's resignation. (SAC ¶¶ 180–86.) This claim also fails.

To allege a stigma-plus claim that Defendants violated Rinaldi's protected liberty interest in his reputation, Rinaldi must show, first, "that the government made stigmatizing statements about [him or her] . . . that call into question [his] good name, reputation, honor or integrity"; second, that "these stigmatizing statements were made public"; and, third, that the statements were made concurrently with "the loss of employment . . . or the termination or alteration of some other legal right or status." *Twardosz v. Yonkers Pub. Sch. Dist.*, No. 19-CV-6138, 2020 WL 6135114, at *4 (S.D.N.Y. Oct. 16, 2020) (quoting first *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (alteration and quotation marks omitted) and then *Velez v. Levy*, 401 F.3d 75, 87–88 (2d Cir. 2005) (citations and quotation marks omitted)); *see also Barzilay*, 610 F.

_____

2288065, at *9 (E.D.N.Y. Aug. 8, 2007) (finding a valid waiver where "the plain language of the Agreement" made its significance regarding waiver clear and where plaintiff "signed the agreement upon the advice of counsel, was aware that he was waiving any claims he had against the Village arising from the disciplinary hearings, and signed the agreement with the specific aim of obtaining an adjournment of the [disciplinary hearing]").

 [9] In their Opposition, Plaintiffs now assert that Rinaldi was also deprived of due process because of Sylvester and Hirshowitz's alleged fabrication of evidence. (*See* Pls' Opp. 15–16.) However, in the SAC, Rinaldi's due process claim is plainly based on coerced resignation, not fabrication of evidence, (*see* SAC ¶¶ 168–79), and it is axiomatic that "Plaintiff[s] cannot amend the Complaint through [their] opposition brief," *e.g.*, *Ne. Plastic Surgery PLLC v. BlueCross BlueShield of Illinois*, No. 24-CV-9148, 2025 WL 1194446, at *3 n.6 (S.D.N.Y. Apr. 22, 2025) (citing *See LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 580 (S.D.N.Y. 2017)).

Supp. 3d at 611 ("To establish a stigma plus claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." (quoting *Vega v. Lantz*, 596 F.3d 77, at 81 (2d Cir. 2010) (internal quotation marks omitted))).  "Because a stigma-plus claim falls under the umbrella of other procedural due process claims, it may be defeated by a showing that a plaintiff was afforded constitutionally-adequate process." *Alterescu v. N.Y.C. Dep't of Educ.*, No. 21-CV-925, 2022 WL 3646050, at *10 (S.D.N.Y. Aug. 23, 2022) (collecting cases); *see also Barzilay*, 610 F. Supp. 3d at 611 ("[I]n order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law.  Stated differently, the availability of adequate process defeats a stigma-plus claim." (quoting *Segal*, 459 F.3d at 212)).

Even assuming that Rinaldi has adequately pled both the "stigma" and the "plus,"[10] his claim fails for the same reason as his other due process claim: the availability of adequate process.  "In a case involving an at-will government employee"—as here—"the availability of an adequate, reasonably prompt post termination name-clearing hearing is sufficient to defeat a stigma-plus claim." *Cummings v. City of New York*, No. 19-CV-7723, 2021 WL 1163654, at *8

---

[10] Defendants do not challenge that Rinaldi pled these two elements, only that he "does not claim Sylvester made stigmatizing charges *concurrently* with his termination," because "[t]here was no termination."  (*See* Defs' Mem. 22 (emphasis added).)  However, coerced resignations can be sufficient to satisfy the state-imposed burden element of a stigma-plus claim. *See Catania v. United Fed'n of Tchrs.*, No. 21-CV-1257, 2025 WL 638625, at *12 (S.D.N.Y. Feb. 27, 2025) (finding plaintiff "satisf[ied] the first two elements of a stigma-plus claim" where she alleged that defendants "made public statements impugning her reputation in an effort to force her termination"), *reconsideration denied*, No. 21-CV-1257, 2025 WL 1114449 (S.D.N.Y. Apr. 15, 2025).  Moreover, although stigma-plus claims often involve statements made at the same time as the state-imposed burden, "perfect parity in the origin of the stigma and the plus is not required." *Velez*, 401 F.3d at 89 (internal quotation marks omitted).

(S.D.N.Y. Mar. 26, 2021) (quoting *Segal*, 459 F.3d at 214).  As discussed above, and as

Defendants argue, (*see* Defs' Mem. 22), Rinaldi had the option of challenging his disciplinary

charges in an Article 78 hearing and chose not to do so.  That alone is sufficient to defeat his

stigma-plus claim.  *See Catania*, 2025 WL 638625, at *13 (dismissing a stigma-plus claim

"[b]ecause [p]laintiff had the opportunity to obtain a name-clearing hearing under [Article 78]");

*see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011) (affirming the

dismissal of a stigma-plus claim where "[a]n Article 78 proceeding provide[d] the requisite post-

deprivation process—even if [the plaintiff] failed to pursue it"); *Barrer-Cohen*, 2019 WL

3456679, at *9 ("Plaintiff's stigma-plus claim is defeated by the availability of an adequate

remedy, an Article 78 proceeding, after her resignation.").

### c.  Fourth Amendment

Next, Zambrano alleges that Defendants violated her Fourth Amendment guarantee

against unreasonable police searches when Sylvester directed the VOPD to track Zambrano's

personal cars with LPR.  (SAC ¶¶ 230–38.)  Defendants argue that this claim must fail because

"Zambrano does not have a reasonable expectation of privacy in her vehicle when traveling on

public roadways."  (Defs' Mem. 23.)

The Fourth Amendment to the U.S. Constitution guarantees that "[t]he right of the people

to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . ."  U.S.

Const. amend. IV.  Although Fourth Amendment search doctrine was historically "tied to

common-law trespass and focused on whether the Government obtains information by physically

intruding on a constitutionally protected area," the Supreme Court has, in recent years,

recognized that the Amendment "protect[s] certain expectations of privacy as well."  *Carpenter*

*v. United States*, 585 U.S. 296, 304 (2018) (citing first *United States v. Jones*, 565 U.S. 400, 405, 406, n.3 (2012), then *Katz v. United States*, 389 U.S. 347, 351 (1967) (internal quotation marks omitted)).  Accordingly, as relevant here, the Government's conduct may constitute a "search" for purposes of the Fourth Amendment if "the [Government] violat[ed] a person's reasonable expectation of privacy."  *United States v. Poller*, 129 F.4th 169, 174 (2d Cir. 2025) (quoting *United States v. Weaver*, 9 F.4th 129, 141 (2d Cir. 2021) (en banc) (internal quotation marks, citations, and emphasis omitted)); *see also Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *13 (S.D.N.Y. Mar. 19, 2024) ("A search occurs when the Government acquires information by . . . invading an area in which the individual has a reasonable expectation of privacy." (quoting *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (quotation marks and citation omitted))).  The legitimate, or reasonable, expectation of privacy test is a "two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?"  *Poller*, 129 F.4th at 174. (citing first *California v. Ciraolo*, 476 U.S. 207, 211 (1986), and then *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

Over recent years, multiple courts have confronted whether the use of LPR technology constitutes a "search" for purposes of the Fourth Amendment.  As one recently noted, the use of LPR "sits at the intersection" of two lines of Fourth Amendment cases: "[o]n the one hand, a car's license plate and exterior appearance belong to a category of vehicle-related identification in which an individual has no reasonable privacy interest.  On the other hand, the ability to track drivers continuously and retroactively raises the specter of a surveillance state."  *United States v. Sturdivant*, No. 22-CR-615, 2025 WL 1633754, at *5 (N.D. Ohio June 9, 2025).

Under the first body of caselaw, courts follow the Supreme Court's "understanding that mere visual observation does not constitute a search." *Poller*, 129 F.4th at 174 (quoting *Jones*, 565 U.S. at 412). Accordingly, it is well established that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in [her] movements from one place to another," *United States v. Knotts*, 460 U.S. 276, 281 (1983), and that objects "ordinarily in plain view of someone outside [an] automobile," such as a vehicle's VIN number, are not "subject to a reasonable expectation of privacy,'" *Poller*, 129 F.4th at 174 (quoting *New York v. Class*, 475 U.S. 106, 118 (1986))).[11]

Under the surveillance body of caselaw, however, the Supreme Court has expressed increasing concern over the Government's use of technology "to encroach upon areas normally guarded from inquisitive eyes." *Carpenter*, 585 U.S. at 305. In *Jones*, the Supreme Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search' within the meaning of the Fourth Amendment." 565 U.S. at 404 (internal quotation marks omitted). Although the Court relied on the Government's physical trespass of the vehicle in reaching that holding, *id.* at 404–11, four concurring Justices would have analyzed the case through a surveillance lens, noting that "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy," *id.* at 430 (Alito, J., concurring); *see also id.* at 415 (Sotomayor, J., concurring).

Next, in *Carpenter*, the Supreme Court considered whether the warrantless acquisition of historical cell-site location information ("CSLI") from a defendant's cell-service providers was

---

[11] Earlier this year, in keeping with this reasoning, the Second Circuit held that a police officer's use of an iPhone camera to see through the tinted windows of a car did not constitute a "search" for Fourth Amendment purposes. *Poller*, 129 F.4th at 172.

an unreasonable search.  585 U.S. at 300.  The data obtained by the Government spanned over a

129-day period and totaled "12,898 location points cataloging Carpenter's movements—an

average of 101 data points per day."  *Id.* at 302.  Partially relying on the reasoning laid out in the

*Jones* concurrences, the Court held that "an individual maintains a legitimate expectation of

privacy in the record of his physical movements as captured through CSLI" and thus, "[t]he

location information obtained from Carpenter's wireless carriers was the product of a search."

*Id.* at 310.  In so holding, the Court noted that

> [m]apping a cell phone's location over the course of 127 days provides an all-
> encompassing record of the holder's whereabouts.  As with GPS information, the
> time-stamped data provides an intimate window into a person's life, revealing not
> only his particular movements, but through them his familial, political,
> professional, religious, and sexual associations.

*Id.* at 311 (internal quotation marks omitted).  The Court also expressed concern about the

retroactive aspect of CSLI, noting that its collection allowed the Government to "travel back in

time to retrace a person's whereabouts."  *Id.* at 312.

Here, Plaintiffs do not contend that "an ordinary license plate check is an unlawful

search" or that "Zambrano has a reasonable expectation of privacy whenever she drives her car."

(*See* Pls' Opp. 19.)  Instead, Plaintiffs argue that because Sylvester's acquisition of "over two

and a half years of LPR information certainly 'provides an all-encompassing record of the

[individual's] whereabouts,'" Sylvester's actions "'invaded' Zambrano's 'reasonable expectation

of privacy in the whole of [her] physical movements,'" similar to *Jones* and *Carpenter.*  (*Id.* at

20–21 (quoting *Carpenter*, 585 U.S. at 311, 313).)

Whether, post-*Carpenter*, the use of LPR constitutes a search for the purposes of the Fourth Amendment is a matter of first impression in the Second Circuit.[12]  However, the Court notes that the Second Circuit recently declined to extend *Carpenter*'s "narrow" ruling to a non-CSLI context, holding that "the use of a stationary pole camera . . . to monitor the publicly visible exterior of a target's business" for an extended period did not constitute a search.  *See United States v. Harry*, 130 F.4th 342, 348, 350 (2d Cir. 2025) (applying the "'open fields doctrine' under which individuals generally do not have a legitimate expectation of privacy in open and accessible areas" (internal quotation marks omitted)).  Moreover, nearly every court outside the Second Circuit that has considered the issue post-*Carpenter* has held that queries of LPR databases do *not* constitute Fourth Amendment searches.[13]

---

[12] In 2019, a court in the Northern District of New York considered a similar challenge but did not consider—much less mention—*Carpenter*'s potential impact on the issue.  *See also Chaney v. City of Albany*, No. 16-CV-1185, 2019 WL 3857995, at *8–9 (N.D.N.Y. Aug. 16, 2019) (finding that the use of LPR was not a Fourth Amendment search and following the reasoning outlined in *People v. Bushey*, 75 N.E.3d 1165 (N.Y. 2017)).

[13] *See, e.g.*, *Sturdivant*, 2025 WL 1633754, at *9–11; *Scholl v. Ill. State Police*, 776 F. Supp. 3d 701, 719–721 (N.D. Ill. 2025); *United States v. Cooper*, No. 23-CR-131, 2025 WL 35035, at *4–7 (E.D.L.A. Jan. 6, 2025); *United States v. Martin*, 753 F. Supp. 3d 454, 466–76 (E.D. Va. 2024); *United States v. Jiles*, No. 23-CR-98, 2024 WL 891956, at *18–19 (D. Neb. Feb. 29, 2024); *State v. Sidor*, 558 P.3d 621, 630–32 (Ariz. Ct. App. 2024); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1339–41 (N.D. Ala. 2023); *United States v. Graham*, No. 21-CR-645, 2022 WL 4132488, at *4–5 (D.N.J. Sept. 12, 2022), *aff'd*, No. 23-3197, 2025 WL 342190 (3d Cir. Jan. 30, 2025); *United States v. Porter*, No. 21-CR-87, 2022 WL 124563, at *3 (N.D. Ill. Jan. 13, 2022); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1124 (N.D. Cal. 2021); *United States v. Brown*, No. 19-CR-949, 2021 WL 4963602, at *3–4 (N.D. Ill. Oct. 26, 2021); *United States v. Bowers*, No. 18-CR-292, 2021 WL 4775977, at *3–5 (W.D. Pa. Oct. 11, 2021); *see also Commonwealth v. McCarthy*, 142 N.E.3d 1090, 1095–109 (Mass. 2020); *cf. United States v. Yang*, 958 F.3d 851, 862 (9th Cir. 2020) (Bea, J., concurring) (noting that, although the majority did not address the question, she would conclude that the search of an LPR database did not infringe on a reasonable expectation of privacy).  *But see Schmidt v. City of Norfolk, et al.*, No. 24-CV-621, 2025 WL 410080, at *7–8 (E.D. Va. Feb. 5, 2025) (following Fourth Circuit precedent extending *Carpenter* to an aerial surveillance system and finding that the plaintiff "plausibly allege[d] a violation of an objectively reasonable expectation of privacy" when challenging the City's "installation and operation of [automatic LPRs]" (citing *Leaders of a*

The Court agrees with this authority.  Here, even if *Carpenter* provides the correct framework to analyze the purported search, the SAC does not allege sufficient facts for the Court to infer that the LPR database reveals the same "depth, breadth, and comprehensive reach" of information such as CSLI.  *Carpenter*, 585 U.S. at 320.  Zambrano alleges only that the LPR helps "pinpoint [a] vehicle's *specific* whereabouts at a *specific* time," and that Sylvester accessed her LPR location information approximately 111 times.  (SAC ¶¶ 135–36 (emphasis added).) Unlike the vast amount of CSLI collected in *Carpenter*—nearly 13,000 data points—the SAC is devoid of allegations suggesting that the LPR is capable of "near perfect surveillance" that could create "an all-encompassing record" of Zambrano's whereabouts or provide an "intimate window" into her life.  585 U.S. at 311–12; *see Scholl*, 776 F. Supp. 3d at 720 ("Because it is less comprehensive, the information recorded by the ALPR system lacks the same 'deeply revealing nature' as the information recorded by the surveillance technologies discussed in *Carpenter* [and] *Jones* . . . ."); *Martin*, 753 F. Supp. 3d at 472–73 (noting that the LPR system at issue "is not meant to 'track' or 'monitor' the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life").[14]  Instead, the data collected here, as alleged, appeared to consist of "discrete data points with considerable stretches of obscurity in between," *Sturdivant*, 2025 WL 1633754, at *10, and thus "provided no more information than what could have been obtained through police surveillance," *Rubin*, 556 F.

---

*Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 333–34 (4th Cir. 2021))); *Commonwealth v. Bell*, 113 Va. Cir. 316, 2024 WL 5516362, at *2 (Va. Cir. Ct. May 10, 2024) (granting a motion to suppress and concluding that the LPR system at issue "collects and records a vehicle's movement data in the same manner as a CSLI").

[14] Nor do the allegations suggest that the LPR system here provides as much comprehensive surveillance as the GPS tracker in *Jones*, which recorded *all* movements of the suspect's car for nearly a month.  565 U.S. at 403.

Supp. 3d at 1130; *see also Carpenter*, 585 U.S. at 311 (noting that, in contrast to a phone, which is "compulsively carr[ied]" with an individual even when they "leave their vehicles," "[a] car has little capacity for escaping public scrutiny" (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion))). Accordingly, the Court agrees with the "nearly uniform consensus of courts that have evaluated the constitutionality of [LPRs]," *Scholl*, 776 F. Supp. 3d at 720, and holds that Plaintiffs have not plausibly alleged that the use of LPRs here violated any reasonable expectation of privacy.

In so holding, the Court does not intend to suggest that the use of LPRs can *never* violate the Fourth Amendment. It is possible that a "more extensive network of [LPRs] might infringe a reasonable expectation of privacy under *Katz*." *Id.* at 721; *Sturdivant*, 2025 WL 1633754, at *11 ("'If the technology evolves' to engender surveillance capabilities comparable to those in *Carpenter*, 'then perhaps in the future a warrant may be required.'" (quoting *Yang*, 958 F.3d at 864 (Bea, J., concurring))). Indeed, the monitoring alleged here—111 searches over two-and-a-half years—is far beyond the monitoring alleged in any LPR case cited herein, demonstrating "a qualitative leap forward." *See Sturdivant*, 2025 WL 1633754, at *11 (collecting cases and noting that the LPR surveillance in that case—"yielding at least 26 photographs of [the defendant's] car over six weeks from an unknown number of total search results—was more extensive than that in many federal cases thus far"). However, because the Court cannot conclude that the facts as currently alleged constitute a search for Fourth Amendment purposes, Plaintiffs' claim must be dismissed.

### d. Equal Protection Claim

Next, Zambrano asserts an equal protection claim, asserting that "Sylvester intentionally discriminated against [her] based on her gender, race, and national origin." (SAC ¶ 221.) In

their Motion, the only basis Defendants cite for dismissing this claim is that it is barred by

Zambrano's settlement release.  (*See* Defs' Mem. 22; Reply 11 n.1.)  As discussed above, the

Court cannot conclude at this time that the settlement barred Zambrano's claims.  Accordingly,

because Defendants offer no other substantive ground for dismissal, the Court denies their

Motion with respect to Zambrano's equal protection claim as to the Individual Defendants.  *See*

*Garcia v. ROC Nation LLC*, No. 24-CV-7587, 2025 WL 1865965, at *15 (S.D.N.Y. July 2,

2025) (declining to dismiss a claim where "defendants offer no arguments why the Court

should"); *Hall v. Warren*, No. 21-CV-6296, 2022 WL 2356700, at *12 (W.D.N.Y. June 30,

2022) (declining "to manufacture additional arguments in favor of dismissal that [the]

[d]efendants fail to raise themselves" and partially denying motion to dismiss); *Rubenstein v.*

*Cosmos Holdings, Inc*., No. 19-CV-6976, 2020 WL 3893347, at *11 (S.D.N.Y. July 10, 2020)

(denying motion to dismiss and "declin[ing] to make arguments for dismissal that [d]efendants

chose not to present"); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d

497, 535 (E.D.N.Y. 2011) (declining to dismiss unjust enrichment claim where defendant did not

raise any arguments supporting dismissal); *cf. Vasquez v. N.Y.C. Dep't of Educ*., No. 11-CV-

3674, 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015) ("Courts generally deem an argument

waived or abandoned if a party fails to make it.").

e.  <u>*Monell* Claim</u>

Next, the Court examines whether the Village can also be held liable for Zambrano's

alleged equal protection violation.[15]

---

[15] Because Plaintiffs have failed to plead a constitutional violation apart from Zambrano's
equal protection claim, that claim provides the only potential basis to establish municipal liability
on the part of the Village.  *See King-Knight v. City of New York*, No. 23-CV-4648, 2025 WL
950507, at *14 (S.D.N.Y. Mar. 28, 2025) ("It is well-settled that a *Monell* claim cannot succeed

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived [her] of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Accordingly,

> to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (recommending dismissal of a claim against agencies where plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3,

---

without an underlying constitutional violation." (quoting *Mastromonaco v. City of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) (summary order)); *see also Johnson v. City of New York*, 21-CV-5268, 2022 WL 4133284, at *6 (S.D.N.Y. Sept. 12, 2022) (dismissing a *Monell* claim where "there [was] no constitutional violation" (citation and quotation marks omitted)).

Further, although Zambrano asserts her equal protection claim against all Individual Defendants in their official capacities, "[w]here the governmental entity can itself be held liable for damages as a result of its official policy, a suit naming the legislators in their official capacity is redundant." *Chelsea Hotel Owner LLC v. City of New York*, No. 21-CV-3982, 2022 WL 4625446, at *5 (S.D.N.Y. Sept. 30, 2022) (citing *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 699 (S.D.N.Y. 2011)). Indeed, "courts in the Second Circuit routinely dismiss official capacity claims against municipal officials as duplicative of the claims against the municipality." *Id.* (quoting *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 409 (S.D.N.Y. 2021)). Accordingly, Zambrano's damages claim against the Individual Defendants in their official capacities are dismissed as duplicative of her damages claim against the Village. *See Morales v. City of New York*, No. 24-CV-1866, 2025 WL 2097600, at *5 (E.D.N.Y. July 25, 2025) ("Because [p]laintiff brings a *Monell* claim against the City, the Court dismisses [p]laintiff's claims against the Policymaker Defendants in their official capacities as duplicative of the *Monell* claim." (internal citation omitted)); *see also Phillips v. County of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (collecting cases).

2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (recommending dismissal of a claim against a county because the complaint "does not allege the existence of an unconstitutional custom or policy"), *adopted as modified sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused

the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Generally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal

policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

Here, Plaintiffs allege *Monell* liability based on two theories: (1) actions by an individual with final decision-making authority; and (2) a widespread practice or custom. (*See* Pls' Opp. 21–26.) Defendants argue that Plaintiffs have failed to plausibly allege a *Monell* claim under either theory. (*See* Defs' Mem. 26–27.)

First, "[a]ctions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Kiss*, 2024 WL 1210941, at *23 (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003)). "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Id.* "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks and citation omitted). When alleging policymakers caused the violation, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *21 (S.D.N.Y. Sept. 28, 2023) (quoting *Guity v. Uniondale Union Free School Dist.*, No. 18-CV-4369, 2019 WL 3402280, at *7 (E.D.N.Y. July 26, 2019) (alteration omitted)). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe*, 542 F.3d at 37.

Plaintiffs allege that Sylvester was "a final decision and policy maker in all matters involving the daily operations of the VOPD," including, as relevant here, "the supervision of subordinate VOPD personnel" and "investigating VOPD officers regarding fitness for duty and alleged attendance violations." (SAC ¶¶ 24, 29.) Zambrano also alleges that Sylvester created a "chronic sick" list, which he used to harass her, (*id.* ¶ 125), directed VOPD personnel to harass her by hand-delivering disciplinary notices and questioning her use of sick time, (*id.* ¶¶ 102, 105, 109, 124–25), and directed VOPD personnel to surveil and track her vehicle through the use of LPR, (*id.* ¶ 135). Zambrano further alleges that Village officials acquiesced in all of Sylvester's actions, including supporting Sylvester in the face of Rennals' EEOC charge, (*id.* ¶¶ 9–12, 33), and deferred to Sylvester's actions regarding Zambrano's disciplinary charges, (*see id.* ¶¶ 111–16, 132, 137, 143, 145). Finally, Plaintiffs point to various VOPD official operational policies, signed by either Sylvester or the current VOPD chief, which include policies on the use of sick time and reasons for being placed on the "chronic sick list," and well as policies on secondary employment and discipline. (*See* Pls' Opp. 23 n.5 (citing Ossining Police Dep't Gen. Order #3.00, https://www.villageofossining.org/sites/g/files/vyhlif4821/f/uploads/go_300_- _use_of_force.pdf (last accessed Sept. 12, 2025); *e.g.*, *id.* at 24 n.6 (citing Ossining Police Dep't Manual 73–76, 90–92 https://www.villageofossining.org/sites/g/files/vyhlif4821/f/uploads/opd_manual_07-03- 2024.pdf (last accessed Sept. 12, 2025)).)[16]

---

[16] The Court may take judicial notice of these webpages. *See Weller v. NYU Langone Health Sys.*, No. 23-CV-8056, 2025 WL 1795397, at *4 (E.D.N.Y. June 30, 2025) ("Courts 'may take judicial notice of documents from official government websites.'" (quoting *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023))); *Wandel v. Gao*, 590 F. Supp. 3d 630, 636 (S.D.N.Y. 2022) ("The Court may take judicial notice of information available on government websites." (citation omitted)).

Although Defendants claim that these allegations are "conclusory," (*see* Defs' Mem. 26–27), the Court concludes that they are sufficient—at this stage—to plead that Sylvester was a final policymaker for the conduct at issue, *see Reynolds v. Village of Chittenango*, No. 19-CV-416, 2023 WL 6460417, at *5 (N.D.N.Y. Oct. 4, 2023) (finding that "[a] chief of police has final discretionary authority over internal discipline and termination of officers in his or her police department, and, as such, can be treated as a final policymaker" (citing *Brown v. City of Syracuse*, No. 01-CV-1523, 2008 WL 5451020, at *6 (N.D.N.Y. Dec. 31, 2008)); *see also Hasper v. County of Suffolk*, No. 11-CV-3227, 2015 WL 806706, at *11 (E.D.N.Y. Feb. 25, 2015) (noting "that a police chief and police commissioner were 'policymakers' under the framework of *Monell*" (citing *Johns v. Town of E. Hampton*, 942 F. Supp. 99, 106 (E.D.N.Y. 1996))); *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 560 (S.D.N.Y. 2006) (noting that a chief of police "is the executive officer of the police force and vested with decision making authority regarding officer assignments" and citing N.Y. Unconsol. Law § 5711–q(21) (McKinney 2006)).

However, Plaintiffs' "widespread practice" theory of *Monell* liability fails. To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty Am.*, 361 F.3d at 126). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing*, 548 F. Supp. 3d at 400 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)). Here, Plaintiff

has only alleged two instances of discrimination on the basis of race and gender—the discrimination against Zambrano and that against Ranells. These allegations are insufficient to establish *Monell* liability on a widespread practice theory. *See Colson v. Mingo*, No. 18-CV-2765, 2025 WL 218520, at \*16 (S.D.N.Y. Jan. 16, 2025) ("[T]he Second Circuit has concluded that two or three instances 'over a period of several years' perpetuated by 'a small number of officers' is insufficient to establish Monell liability." (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012))); *see also McCormick v. County of Westchester*, No. 19-CV-2916, 2023 WL 2632204, at \*10 n.6 (S.D.N.Y. Mar. 24, 2023) (noting that "two or three instances of unconstitutional deprivation" are "inadequate to prove a widespread custom under *Monell*" and collecting cases).

Accordingly, because Zambrano's *Monell* claim can proceed on a final policymaker theory, Defendants' Motion is denied as to her equal protection claim against the Village.

### 3. State Law Claims

#### a. Fraud in the Inducement

Next, Plaintiffs allege that they were fraudulently induced into signing the settlement agreements, in violation of New York law. (SAC ¶¶ 187–94, 239–45.) Defendants argue this claim fails because Plaintiffs fail to state a specific, fraudulent misrepresentation other than Sylvester's alleged intent to not perform under the contract. (Defs' Mem. 31–33; Reply 8–9.) The Court agrees.

"New York law does not recognize claims that are essentially contract claims masquerading as claims of fraud." *Airport Mart Inc. v. Dunkin' Donuts Franchising LLC*, No. 18-CV-170, 2019 WL 4413052, at \*10 (S.D.N.Y. Sept. 16, 2019) (quoting *W.B. David & Co. v. DWA Commc'ns, Inc.*, No. 02-CV-8479, 2004 WL 369147, at \*3 (S.D.N.Y. Feb. 26, 2004));

*Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 373 (S.D.N.Y. 2024) ("[U]nder New York law, a fraud claim alleged in the context of a contract dispute must be dismissed to the extent that it 'restat[es] what is, in substance, a claim for breach of contract.'" (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006)).

> Instead,

> [i]n a case involving a breach of contract, a fraud claim may arise only where the alleged misrepresentations concern a matter separate from the contract obligations themselves.  In other words, a fraud claim may exist only where the alleged misrepresentations concern a 'present' fact (i.e., the financial stability of the company) as opposed to a statement of future intent (i.e., that something will be provided as part of the proposed contract).

*Airport Mart Inc.*, 2019 WL 4413052, at *10 (quoting *Microtel Franchise & Dev. Corp. v. Country Inn Hotel*, 923 F. Supp. 415, 417 (W.D.N.Y. 1996)).  When a claim of fraudulent inducement is brought with a breach of contract claim, the two must be "sufficiently distinct" and the plaintiff must: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted).

Plaintiffs have failed to allege that their fraudulent inducement claims and breach of contract claims are sufficiently distinct.  Plaintiffs claim that they were fraudulently induced into signing their respective agreements because they received contractual assurances of confidentiality, but that "Sylvester planned to breach" those provisions before even signing.  (*See* SAC ¶¶ 191–93, 242–44.)  In other words, the only misrepresentation they allege is Sylvester's intent not to honor the contract.  Because, "[a] party's mere promise to perform its contractual obligations, even if knowingly false at the time of making, is not enough to support a claim of

fraud under New York law," *Digilytic Int'l FZE v. Alchemy Fin., Inc.,* No. 20-CV-4650, 2022 WL 912965, at *7 (S.D.N.Y. Mar. 29, 2022) (citing *Bridgestone/Firestone, Inc.*, 98 F.3d at 19), Plaintiffs' fraud claims must be dismissed, *see Sweet Baby Lightning Enters. LLC v. Keystone Cap. Corp*., No. 21-CV-6528, 2023 WL 5334016, at *4 (S.D.N.Y. Aug. 18, 2023) ("Plaintiffs do not allege anything more than promises to perform under the contract, which cannot support a fraud claim."); *Airport Mart, Inc.*, 2019 WL 4413052, at *12 (dismissing fraud claim where the allegations supporting that claim "are also the bases for the various allegations in the breach of contract claim").[17]

### b. Breach of Contract

To state a claim for breach of contract under New York law, a plaintiff must plead: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Mongiello v. HSBC Bank USA NA as Tr. for LMT 2006-6 Tr. Fund*, No. 24-CV-2291, 2025 WL 674345, at *9 (S.D.N.Y. Mar. 3, 2025) (citing *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)); *see also Markatos*, 760 F. Supp. 3d at 84 (same).  "To plead these

---

[17] Plaintiffs assert that rule described above, followed by courts in this Circuit, was espoused by New York's intermediate courts and is directly contrary to the cases issued by the New York Court of Appeals, such as *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 502 N.E.2d 1003 (N.Y. 1986).  (*See* Pls' Opp. 33–34.)  However, in *Bridgestone/Firestone*, the Second Circuit cited those Court of Appeals cases as outlining *exceptions* to the standard rule, rather than as prescribed a new, and contradicting, rule.  *See* 98 F.3d at 20 (outlining various exceptions and citing *Deerfield*); *see also Marriott Int'l, Inc. v. Downtown Athletic Club of N.Y.C., Inc.*, No. 02-CV-3906, 2003 WL 21314056, at *6 n.3 (S.D.N.Y. June 9, 2003) ("The Second Circuit and courts in this district have resolved the conflict between the state cases by following the Appellate Division's rule and crafting fact-specific exceptions that account for the Court of Appeals' decisions." (citing *Bridgestone/Firestone*, 98 F.3d at 20, and *Papa's June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1161 (S.D.N.Y. 1996)); *see also Cougar Audio, Inc. v. Reich,* No. 99-CV-4498, 2000 WL 420546, at *6 n.4 (S.D.N.Y. Apr. 18, 2000) (collecting cases).

elements, 'a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue.'" *Ellington*, 837 F. Supp. 2d at 189 (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001)).  "Moreover, 'stating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract.'"  *Id.* (alteration adopted) (quoting *Berman v. Sugo L.L.C.*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008)).

Here, the existence of the settlement agreements is undisputed and, as discussed above, Plaintiffs have alleged that Defendants breached the Confidentiality Provision and the Disclosure Limitation of their respective settlements.  (*See* supra Section II.B.1.)  Moreover, they have alleged that they suffered damages—i.e., loss of future employment wages—as a result of that breach.  (*See* SAC ¶¶ 86–87, 155, 201–06, 246–49.)  Accordingly, the Court finds that Plaintiffs have adequately pled breaches of contract and denies Defendants' Motion as to these claims.  *See Digilytic Int'l FZE*, 2022 WL 912965, at *7 (denying motion to dismiss where the plaintiffs alleged the existence of specific contracts, breach of specific provisions, and damages from the breach); *see also Shoppertrak RCT Corp.*, 2021 WL 517819, at *2 (denying motion to dismiss where the plaintiff pled that a specific provision of a contract was breached).[18]

c.  Tortious Interference

Plaintiffs allege that Sylvester "malicious[ly] interfer[ed] with Rinaldi's job search" and with "Zambrano's efforts to work for other Westchester Couty law-enforcement agencies."  (*See*

---

[18] Defendants' arguments to the contrary are unavailing.  Although Defendants suggest that the Rinaldi disclosures were mandated by state law, they also concede that Sylvester disclosed the existence of the settlement agreement "to News 12 over two weeks after [Rinaldi] signed the deal," which, as alleged, is a clear breach.  (*See* Defs' Mem. 29–30.)  And while Defendants argue that Zambrano's allegations are conclusory, the Court finds that the SAC contains sufficient detail about the alleged disclosures to state a claim.  (*See* SAC ¶ 155 ("Upon their inquiries regarding Zambrano's job applications, Sylvester disparaged Zambrano as a police officer . . . ."); *id.* ¶ 247 ("Specifically, Sylvester improperly disclosed information about Zambrano's dismissed disciplinary charges.").)

SAC ¶¶ 201–06, 250–54.)  Defendants offer no substantive reason to dismiss Rinaldi's claim,

(*see generally* Defs' Mem.; Reply), and thus, their Motion as to his tortious inference claim is

denied, *Garcia*, 2025 WL 1865965, at *15; *Rubenstein*, 2020 WL 3893347, at *11.

As for Zambrano's claim, Defendants argue only that her claim is barred, as the three-

year statute of limitations began to run in 2019 "when she unsuccessfully interviewed with

various police departments," but she did not file suit until July 2023.  (*See* Defs' Mem. 28.)  As

Plaintiffs point out, Defendants misread the allegations in the SAC.  (Pls' Opp'n 33.)  Instead,

Zambrano alleges that Sylvester only began to interfere with her prospective job prospects *after*

her July 8, 2020 resignation, and continued to do so for an undefined time afterward.  (*See* SAC

¶¶ 153, 155.)  Accordingly, because the Court cannot conclude from the face of the complaint

that Zambrano's claim is time-barred, Defendants' Motion is denied as to her tortious

interference claim.  *See Doe 1 v. Gov't of United States Virgin Islands*, 771 F. Supp. 3d 379, 399

(S.D.N.Y. 2025) ("A motion based on the statute of limitations is an affirmative defense and can

only be granted if the defense is apparent on the face of the complaint." (internal quotation marks

omitted)); *Gudanowski v. Burrell*, No. 20-CV-111, 2021 WL 3887612, at *3 (S.D.N.Y. Aug. 31,

2021) ("[O]n a Rule 12(b)(6) motion, the Court may only dismiss an action based on the statute

of limitations if, on the face of the complaint, it is clear the claim is untimely.").

### 3.  Motion to Strike

Finally, Defendants also ask the Court to strike from the SAC the "immaterial,

impertinent, and scandalous allegations about Chief Sylvester and Emily Hirshowitz having a

sexual relationship."  (*See* Defs' Mem. 27.)  Federal Rule of Civil Procedure 12(f) permits courts

to "strike from a pleading . . . scandalous matter."  Fed. R. Civ. P. 12(f).  A "pleading" includes:

"(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a

counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to answer." *Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, No. 09-CV-2669, 2015 WL 4757601, at *3 (S.D.N.Y. Aug. 12, 2015) (citing Fed. R. Civ. P. 7(a)).

"Federal courts have discretion in deciding whether to grant motions to strike." *Azzarmi v. Sedgwick Claims Mgmt. Servs., Inc.,* No. 20-CV-9155, 2025 WL 35003, at *10 (S.D.N.Y. Jan. 6, 2025) (quoting *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. 2019)). "However, motions to strike under Rule 12(f) are disfavored and granted only if there is strong reason to do so." *Tacon v. Cromwell*, No. 23-CV-8100, 2024 WL 4275625, at *17 n.21 (S.D.N.Y. Sept. 24, 2024) (quoting *Sweigert v. Goodman*, No. 18-CV-8653, 2021 WL 603069, at *1 (S.D.N.Y. Feb. 16, 2021)); *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 559 (S.D.N.Y. 2023) (same).

As such, the "movant must meet a high bar to prevail on a motion to strike." *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2020 WL 6274826, at *42 (S.D.N.Y. Oct. 24, 2020) (quoting *Morelli v. Alters*, No. 19-CV-10707, 2020 WL 1285513, at *15 (S.D.N.Y. Mar. 18, 2020) (internal quotation marks omitted)). The Second Circuit has instructed that "ordinarily" a district court should not "decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." *Crosby*, 695 F. Supp. 3d at 559 (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)); *see also Frio Energy Partners, LLC. v. Finance Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 352–53 (S.D.N.Y. June 27, 2023) (quoting *Lipsky*, 551 F.2d at 893). "Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." *Crosby*, 695 F. Supp. 3d at

559; *see also Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 398 (S.D.N.Y. 2006) ("The Second Circuit has made clear that district courts should be wary when deciding whether to grant a Rule 12(f) motion on the ground that the matter is impertinent and immaterial."). "[T]o prevail on a Rule 12(f) motion to strike, the movant must show '(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant.'" *Lynch v. Southampton Animal Shelter Found., Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y. 2011) (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)); *see also Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 429 (S.D.N.Y. 2019) ("Motions to strike under Rule 12(f) 'should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.'" (citation omitted)).

Here, Defendants have asked the Court to strike paragraphs 8, 35, 36, 90, 98, and 172 of the SAC because Plaintiffs' "allegation that the Police Chief had an ongoing sexual relationship with a police officer is not only false and defamatory, but it has nothing to do with [Plaintiffs'] claim for damages." (Defs' Mem. 27.) Plaintiffs contend that Sylvester and Hirshowitz's "intimate relationship . . . is directly pertinent to [P]laintiffs' claims," as it provides support for the fabricated evidence allegations, demonstrates collusion, and "speaks volumes as to the power [Sylvester] exercised over the Village Trustees," which "goes to the heart of municipal liability in this case." (Pls' Opp. 27–28.)

Although the Court notes that certain of the allegations—i.e., the purported gym tryst— seem to push the outer bounds of relevance, the Court cannot conclude that the allegations, taken as true, have no potential bearing on the issues in this case. Indeed, the crux of the Action hinges

on Sylvester's alleged misconduct and targeted versus preferential actions toward certain VOPD personnel.  (*See generally* SAC.)  While "Plaintiff[s] offer scant evidence in [their] pleadings" that these allegations directly bear on Plaintiffs' claims, "the Court's focus on a Rule 12(f) motion is not the merits of the complaint or even whether it plausibly states a claim, but rather, accepting the allegations as true, . . . whether they are potentially relevant to the Plaintiff[s'] claims and whether they are unduly prejudicial to the Defendants." *Li v. China Merchants Bank Co.*, No. 22-CV-9309, 2023 WL 2955293, at *3 (S.D.N.Y. Apr. 14, 2023) (citations and internal quotation marks omitted and alterations adopted).  Accordingly, the Court cannot say, at this stage, that "the allegations in question can have no possible bearing on the subject matter of the litigation." *Cardwell*, 2020 WL 6274826, at *42 (internal quotation marks omitted).

Moreover, the Court does not find that the inclusion of these paragraphs would prejudice Defendants.  "Courts have found allegations to be prejudicial when they are amorphous, unspecific and cannot be defended against and where the allegations, if publicized, harm [the defendant] in the public eye and could influence prospective jury members." *Crosby*, 695 F. Supp. 3d at 560 (quoting *Low v. Robb*, No. 11-CV-2321, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012)).  Defendants argue only that "Plaintiffs included the false statement for no reason but spite and to generate media coverage, spreading the falsehood to an even wider audience." (Defs' Mem. 27–28.)  Absent more, the Court cannot conclude that the continued inclusion of these paragraphs would prejudice Defendants.  *See Li*, 2023 WL 2955293, at *4 (declining to find prejudice where defendants asserted that the information was "offered solely for the purpose of attempting to prejudice [d]efendants"); *Crosby*, 695 F. Supp. 3d at 559 (finding no prejudice where defendants asserted that "[t]he only possible motivation for including the allegations

appears to be to defame and embarrass the corporate and individual [d]efendants" (internal

citation omitted)).

Accordingly, the Court denies Defendants' motion to strike the above-enumerated

paragraphs. *See Crosby*, 695 F. Supp. 3d at 560 (declining to strike allegations that "could be

relevant" to the plaintiff's various claims); *Cardwell*, 2020 WL 6274826, at *4 (declining to

strike allegations that "could well bear on the subject matter of the litigation" (quotation marks

and alterations omitted)); *cf. Azzarmi*, 2025 WL 35003, at *10 (declining to strike "abusive

language" against the defendants because, although it was "disturbing and concerning," it "ha[d]

not risen to the level required [for the Court] to exercise its inherent authority to strike").

### III. Conclusion

For the foregoing reasons, Defendants' Motion is denied in part and granted in part.  In

summary, the Court denies Defendants' Motion as to Zambrano's equal protection claim against

the Individual Defendants and the Village, Rinaldi and Zambrano's breach of contract claims,

and Rinaldi and Zambrano's tortious interference claims.  The Court also denies Defendants'

Motion to strike.

The Court grants Defendants' Motion as to all other claims, which are dismissed as to all

Defendants, and as to Zambrano's equal protection claim to the extent it is asserted against the

Individual Defendants in their official capacities.  The Court's dismissal of these claims is

without prejudice because this is the first adjudication of Plaintiffs' claims on the merits.

If Plaintiffs wish to file a third amended complaint alleging additional facts and otherwise

addressing the deficiencies identified above, Plaintiffs must do so within thirty days of the date

of this Opinion & Order.  *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913,

at *19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford Plaintiff an opportunity to amend if,

after reviewing this Order and Opinion and the law therein, he still believes that he can plausibly

state claims against Defendants." (alteration adopted) (citation omitted)).  There will be no

extensions.  Plaintiffs are further advised that a third amended complaint will completely replace,

not supplement, the SAC.  Any amended complaint must therefore contain *all* of the claims,

defendants, and factual allegations that Plaintiffs wish the Court to consider.  If Plaintiffs fail to

timely file a third amended complaint, the dismissed claims may be dismissed with prejudice.

     The Court will hold a telephonic conference on November 12, 2025, at 3:00 PM.

     The Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt.

No. 38.)

SO ORDERED.

DATED:     September 19, 2025
            White Plains, New York

                    KENNETH M. KARAS
                    UNITED STATES DISTRICT JUDGE