UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS R. RINALDI and ANDREA K. ZAMBRANO,<br><br>                            Plaintiffs,<br><br>– against –<br><br>KEVIN SYLVESTER, in his personal capacity and in his capacity as the former Chief of Police for the Village of Ossining, EMILY HIRSHOWITZ, in her personal capacity and in her capacity as a Police Officer for the Village of Ossining, STUART KAHAN, in his personal capacity and in his capacity as Corporation Counsel for the Village of Ossining, the BOARD OF TRUSTEES FOR THE VILLAGE OF OSSINING, and THE VILLAGE OF OSSINING,<br><br>                              Defendants. | Dkt. No. 24-cv-272<br>(KMK)<br><br>**THIRD AMENDED<br>COMPLAINT**<br><br>**JURY DEMANDED** |

### THIRD AMENDED COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF 42 U.S.C. § 1983, BREACH OF CONTRACT, AND TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

Plaintiffs Louis R. Rinaldi ("Rinaldi") and Andrea K. Zambrano ("Zambrano") (collectively, "Plaintiffs"), by and through their undersigned counsel, Broadfield LLP, Abrams Fensterman, LLP and the Law Offices of Michael G. Santangelo, PLLC, respectfully allege as follows:

### NATURE OF THE ACTION

1.      In January 2016, defendant Kevin Sylvester ("Sylvester") was appointed the youngest chief of police ever to serve the Village of Ossining Police Department ("VOPD"). Indeed, Sylvester was the youngest police chief ever appointed in all of Westchester County. His family has lived and worked in the defendant Village of Ossining ("Village") for generations. And during his nearly eight-year tenure as police chief, Sylvester was widely

known throughout the community, projecting himself on local media as a fair, good-natured, and responsible public servant who was deeply committed to the Village and its residents.

2.      During his time as VOPD chief, he was also very popular with many local elected officials, including the Village's mayor and defendant the Villages' Board of Trustees ("Trustees"). They regularly touted his service as exemplary and uniformly supported his actions in running the police department. Sylvester repeatedly told VOPD personnel that he was in complete control of the department and that the Trustees followed his directions.

3.      On December 6, 2023, Sylvester abruptly announced his "separation" from the VOPD and his "confidential separation agreement" was unanimously approved by the Trustees. That extraordinarily generous agreement—which is far from ordinary for someone whose job contract is about to lapse of its own accord—provides troubling insight into the parties' relationship. A true and correct copy of Sylvester's confidential separation agreement, dated December 6, 2023, is annexed as Exhibit A.

4.      Sylvester's confidential settlement agreement awarded him over $160,000. Ordinarily, although a retiring village police chief might get a gold watch for years of valued service, it is rather striking when one gets hundreds of thousands of dollars "as a way of amicably resolving all matters related to [his] retirement." That observation is especially true when the agreement requires "Sylvester's unconditional and irrevocable resignation," and further demands that he "reasonably cooperate in good faith with the Village . . . on pending and future litigation relating to [discrimination claims against the Village] pertaining to Sylvester's employment."

5.      On December 21, 2023, apparently caught up in a wave of staged adulation, Westchester County Legislator and former Village trustee Catherine Borgia declared it "Police

Chief Kevin Sylvester Day" and posted that message on the electronic billboard outside the Westchester County Center. Sylvester thus seemed to have cemented his status as a local celebrity.

6.      But things are often not what they seem.  Sylvester has a dark and vindictive side. He repeatedly retaliated against VOPD officers for abusive, arbitrary, and discriminatory reasons, coercing multiple police personnel to resign from their jobs.  And once they resigned, Sylvester— in blatant and willful violation of binding settlement contracts—maliciously prevented those officers from securing employment at other police departments.

7.      In truth, rather than serving humbly as a small-town hero, Sylvester reigned over the VOPD as a petty tyrant.  He spitefully violated the civil rights of multiple police officers with impunity, acting all-the-while under color of state law and shielded (if not supported) by Village officials.

8.      Sylvester did not act alone in ruining peoples' lives.  He conscripted defendant Emily Hirshowitz ("Hirshowitz"), a subordinate VOPD officer with whom he had a sexual relationship, to press false criminal charges against Rinaldi and to spread similar, harassing rumors about Zambrano.  And for *years*, he unlawfully directed subordinate VOPD personnel to stalk other officers around the clock—improperly and without legal justification—by using advanced license plate tracking technology that is strictly reserved for legitimate police investigations, only.

9.      Inexplicably, members of the Village government enabled Sylvester's ongoing, malicious, and unlawful conduct.  Multiple VOPD officers and the Police Benevolent Association ("PBA") submitted grievances to the Village about Sylvester's abusive and discriminatory conduct.  The Equal Employment Opportunity Commission ("EEOC") even

3

investigated Sylvester and found good cause to conclude that he discriminated against a VOPD officer because she is a Hispanic woman. Yet, Village officials refused to take corrective action.

10.  Certainly, mayor Rika Levin ("Levin"), deputy mayor and trustee Omar Lopez ("Lopez"), Village Manager Karen D'Attore ("D'Attore"), defendant Village corporation counsel Stuart Kahan ("Kahan"), and trustees Robert Fritsche, Dana White, and Manuel Quezada were all aware of the numerous and serious complaints about Sylvester's abusive behavior. But they did *nothing* to protect VOPD personnel.

11.  Instead, for example, when the EEOC announced its finding that Sylvester had likely discriminated against at least one officer based on race and gender, Kahan stated to the press that the Village disagreed with the EEOC's finding and will *not cooperate* the agency's voluntary mediation process. A true and correct copy of the EEOC's determination, dated September 11, 2023, is annexed as Exhibit B.

12.  The Village received the EEOC's damning assessment almost *three months* before Sylvester "separated" from the VOPD. But when Sylvester later stepped down, Levin nevertheless applauded him for having "proven himself to be a leader and innovator, bringing 21st Century Policing to Ossining, [and] strengthening the use of new technologies."

13.  Similarly, Lopez praised Sylvester, having been quoted as saying, "I'm grateful to have had [Sylvester] as a chief. [His] level of accomplishments is indicative of how [he is] as a person and how [he] served the community." The tragic irony in that statement is self-evident.

14.  Any characterization by Village officials of Sylvester as a role model for police chiefs could not be further from the truth, and they knew it. Nevertheless, when Sylvester

repeatedly submitted fabricated disciplinary charges against VOPD officers to coerce their resignations, Kahan and the Trustees repeatedly rubberstamped Sylvester's proposed settlements requiring those officers to quit the force. They never meaningfully reviewed either the charges or the settlements, much less the plainly coercive tactics used by Sylvester against VOPD personnel.

15.     Sylvester's pernicious actions went unchecked for far too long. They destroyed Plaintiffs' law-enforcement careers, both of whom were dedicated and highly respected VOPD officers. In doing so, Sylvester impugned Plaintiffs' mental health, forced them to undergo psychiatric evaluations and residential drug treatment programs that were entirely and demonstrably unnecessary, harassed them at home and on the job with disciplinary actions based on bogus domestic assault accusations and job attendance infractions, suspended them from work without pay and/or medical coverage, and even went so far as to press false criminal charges against Rinaldi.

16.     Those malicious charges were concocted by Sylvester and his paramour, Hirshowitz. Hirshowitz was criminally prosecuted by the Westchester County District Attorney's Office ("D.A.") for her misconduct. A true and correct copy of the criminal complaint filed against Hirshowitz, dated June 28, 2023, is annexed as Exhibit C. After trial, she was acquitted of criminal charges by a jury.

17.     As a part of his persecutory rampage against Plaintiffs, Sylvester also tricked them into resigning their VOPD jobs by including confidentiality provisions in their Village settlement agreements upon which Plaintiffs relied to get new police jobs. Sylvester *never* intended to observe those provisions, however. And by breaching those agreements, Sylvester ensured that no other police department in Westchester County would hire Plaintiffs.

18.     In the mix of his unchecked aggression, Sylvester also implemented an unlawful and punitive surveillance practice employed by the VOPD. Without any bona fide law enforcement justification, Sylvester used advanced license plate recognition ("LPR") technology to track employees' whereabouts at all times.  In Zambrano's case, he literally compiled tracking data spanning more than *two years*.  He even tracked Zambrano *after* she was suspended without pay from the VOPD.

19.     Those actions were depraved, and by committing them, Sylvester (and others) violated a bedrock due process right against governmental abuse, as well as one of the Constitution's most hallowed privacy guarantees—the right to be free of unreasonable searches and seizures.

20.     Although Sylvester "separated" from the VOPD, the injuries that he inflicted on good cops persist. This action seeks to hold Sylvester, his cohorts, and the Village to account for their outrageous and illegal abuses of power.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and venue is properly laid in this district pursuant to 28 U.S.C. § 1391, as all defendants reside or are located in this district and a substantial part of the events giving rise to this action occurred here.

## THE PARTIES

22.     At all times relevant to this action, Rinaldi was and remains a resident of Westchester County, New York.  On August 3, 2015, Rinaldi was hired by the Village as an officer of the VOPD.

23.     At all times relevant to this action, Zambrano was and remains a resident of Westchester County, New York.  On August 1, 2016, Zambrano was hired by the Village as an officer of the VOPD.  Zambrano is a Hispanic woman.

24.     At all times relevant to this action, Sylvester was the chief of police for the VOPD. In that position, Sylvester was a final decision and policy maker in all matters involving the daily operations of the VOPD, including the supervision of subordinate VOPD personnel, establishing rules of professional police conduct within the VOPD, and investigating VOPD officers regarding fitness for duty and alleged attendance violations.  Sylvester is also a trained attorney and admitted to practice law in New York State. All actions taken by Sylvester against Plaintiffs and others that form the basis of this action were taken under color of state law. Sylvester is sued in both his personal and official capacities.

25.     At all times relevant to this action, Hirshowitz was a police officer employed by the VOPD.  All actions taken by Hirshowitz against Plaintiffs and others that form the basis of this action were taken under color of state law.  Hirshowitz is sued in both her personal and official capacities.

26.     At all times relevant to this action, Kahan was the corporation counsel for the Village.  All actions taken by Kahan against Plaintiffs and others that form the basis for this action were taken under color of state law.  Kahan is sued both in his personal and official capacities.

27.     At all times relevant to this action, the Trustees were the elected legislative body for the Village, with the authority to appoint the Village police chief and to adjudicate VOPD disciplinary charges.  All actions taken by the Trustees against Plaintiffs and others that form the basis for this action were taken under color of state law.

28.     At all times relevant to this action, the Village was and remains a municipal corporation organized and existing under and by virtue of the laws of New York State.  All actions taken by the Village against Plaintiffs and others that form the basis for this action were taken under color of state law.

## FACTUAL ALLEGATIONS

### I.     Sylvester's History of Viciously Harassing VOPD Personnel.

29.     As chief, Sylvester held the VOPD's highest command and administrative position. Sylvester was the final decisionmaker for all VOPD's internal operations and, together with the Trustees, was a policymaker regarding VOPD internal disciplinary matters.  In truth, however, the Trustees consistently acquiesced to Sylvester's disciplinary demands regarding VOPD personnel.

30.     Since becoming VOPD chief in 2016, Sylvester abused his authority and harassed numerous police officers under his command.  Using personal harassment, threats of unfounded disciplinary action, discriminatory and immediate suspensions without pay or medical benefits, and fabricated disciplinary charges, Sylvester repeatedly coerced VOPD officers to resign from the force—even some officers who enjoyed long and successful VOPD careers.

31.     After maliciously forcing police officers from VOPD service, Sylvester—again and again—vindictively obstructed their efforts to find police work elsewhere.  To that end, and on information and belief, Sylvester contacted several police officials in Westchester County to dissuade them from hiring former VOPD officers.  During his tenure as VOPD chief, Sylvester was President of the Westchester County Chief's Association, President of the New

York State Police Association, and served on the Executive Board of the New York State Association of Chiefs of Police. As such, Sylvester wielded power and influence over fellow police chiefs in New York.

32.     On information and belief, while he was chief, at least three complaints accusing Sylvester of discrimination or harassment were filed by police officers with the Village and at least six similar union grievances were lodged against him with the Ossining PBA.

33.     On information and belief, since 2021, Sylvester coerced at least three other VOPD personnel besides Plaintiffs to resign from their jobs. Those officers include:

- Marvise Rennalls ("Rennalls"): Like Zambrano, Rennalls is a Hispanic woman who served as a VOPD officer while Sylvester was chief. For several years, she was subject to a hostile work environment created by Sylvester. His abusive conduct included maliciously sending Rennalls along with Zambrano for a psychological evaluation in Albany, New York, to determine if she was fit for duty.

  Rennalls filed multiple harassment complaints and grievances with the Village about other disparate and discriminatory treatment by Sylvester, which the Village rejected. In 2021, Rennalls was ultimately coerced by Sylvester into resigning to escape the abuse.

  Rennalls also filed an EEOC complaint against Sylvester, however, alleging that she had been discriminated against because of her gender and Hispanic origin. After an administrative investigation, the EEOC determined in September 2023 that there was reasonable cause to believe that Rennells suffered discrimination and retaliation based on race, gender, and national origin. The EEOC has credible witnesses who corroborate Sylvester's statement that Rennells was "useless," that he was going to push her out of her job at the VOPD, and that she "could do nothing" because she is a Hispanic female. *See* Exhibit B.

  In February 2025, Rennalls commenced a federal discrimination action against Sylvester and the Village, alleging much the same harassment that Zambrano (the only other female Hispanic officer employed by the VOPD) has experienced. A true and correct copy of Rennalls's federal court complaint, dated February 25, 2025, is annexed as Exhibit D.

9

- Andrew Pavone ("Pavone"):  In early February 2020, Sylvester served then-VOPD officer Pavone—the best man at Sylvester's wedding and the Godfather of Sylvester's child—with disciplinary charges and further requested that Pavone be put on administrative leave pending an investigation by the D.A.  The D.A. determined that the alleged incident under investigation lacked merit and closed the inquiry on October 20, 2020.

  In March 2021, Pavone signed an irrevocable letter of resignation from the VOPD that would be effective on the 20th anniversary of his service and forfeited 30 days of pay.  The settlement states that, [u]pon submitting his resignation, Officer Pavone shall be deemed a retiree in good standing."

  Subsequently, Sylvester learned that Pavone intended to seek part-time employment with another police department in Westchester County.  Upon information and belief, in response to that news, and despite the provision in Pavone's VOPD resignation agreement acknowledging that he remained in "good standing," Sylvester successfully petitioned New York State to decertify Pavone as a police officer.  That decertification blocked Pavone's ability to gain part-time police employment elsewhere.  Upon further information and belief, Sylvester also successfully terminated Pavone's medical benefits, which were set to continue after his retirement from the VOPD.

- Edward Walker ("Walker"):  In April 2022, Sylvester served veteran VOPD detective Walker with disciplinary charges and placed him on administrative leave. Upon information and belief, those disciplinary charges were bolstered by information that Sylvester improperly obtained by using advanced technology, LPR, to track Walker's license plate without a good-faith law-enforcement justification.  Moreover, Walker is a Black male, and, upon information and belief, the use of LPR to track his license plate was conducted discriminatorily based on his race.

  Like Pavone, Walker was also required to sign an irrevocable letter of resignation that would become effective on the 20th anniversary of his VOPD service.  Upon information and belief, that anniversary date was in December 2024, inexplicably leaving Walker on the police force for two more years.  Walker was also required to forfeit over 40 days of paid leave and holiday time.  As part of the settlement, Walker was also required in the interim to pursue his disability status and retirement.

## II.   Sylvester's Relationship with Hirshowitz.

34.   Sylvester hired Hirshowitz as a VOPD officer in May 2016.

35.   Thereafter, upon information and belief, Sylvester and Hirshowitz began a romantic relationship.

36.   Hirshowitz told Rinaldi and others that she was involved in a sexual relationship with Sylvester.

37.   In 2018 and 2019, Sylvester and Hirshowitz travelled out-of-state together to compete in athletic competitions. Upon information and belief, neither Sylvester nor Hirshowitz was accompanied on those trips by family or friends.

38.   Upon information and belief, Sylvester and Hirshowitz met on numerous occasions in the very early morning hours at the VOPD gym for physical workouts.

39.   Upon information and belief, on one such occasion, an elderly building custodian observed them having intimate relations. That custodian had worked in the VOPD building for decades. Soon after his surprise gym encounter with Sylvester and Hirshowitz, the custodian was suddenly transferred to another Village agency at a different building location.

40.   On information and belief, Sylvester and Hirshowitz have also been observed on numerous occasions meeting in the outdoor parking lot of Hirshowitz's apartment building in Peekskill, New York.

## III.   Sylvester Sadistically and Relentlessly Harasses Rinaldi.

41.   Rinaldi's performance as a VOPD officer while on duty was commendable. He never received negative evaluations and received glowing recommendations from his direct supervisors and other VOPD superiors.

42.   In November 2017, Rinaldi was accepted as a transfer candidate by the

11

Westchester County Department of Public Safety and resigned from the VOPD. But he ultimately rescinded his resignation and declined to transfer to the Westchester County Department of Public Safety because his father was having health difficulties and Rinaldi needed to be geographically close to care for him.

43.     The following year, in June 2018, Rinaldi was surprised and confused when Sylvester personally came to his home and told him that he (Sylvester) and Village officials believed that Rinaldi needed treatment for a substance abuse problem. Sylvester further ordered Rinaldi to report promptly to Arms Acres, an inpatient treatment facility for individuals with substance abuse disorders.

44.     Rinaldi did not have a substance abuse problem. Nor had he recently taken a drug test, much less tested positive for drug use.

45.     Nevertheless, afraid for his job and worried by Sylvester's inexplicable demand, Rinaldi complied with Sylvester's directive.

46.     On June 14, 2018, a care provider at Arms Acres told Rinaldi that he did not believe that he required treatment at the facility and discharged him.

47.     That same day, Sylvester confronted Rinaldi about his discharge from the facility and insisted that Rinaldi still required treatment. Sylvester told Rinaldi that, if he refused to re- enter a residential drug treatment facility, he would bring disciplinary charges against him and that Rinaldi "would be fired."

48.     When Rinaldi refused to admit himself needlessly to a residential drug rehabilitation center, Sylvester placed him on administrative leave pending disciplinary charges and then subsequently suspended him.

49.     Coerced by Sylvester, and as a condition for keeping his job, Rinaldi agreed

12

on June 18, 2018 to enter an in-patient treatment program the following week at a facility called The Freedom Model.

50.     When Rinaldi gave in to Sylvester's baseless and extortive order, Sylvester lifted Rinaldi's suspension and had him reinstated to "modified duty," which is not a defined job status within the VOPD.

51.     On July 19, 2018, Rinaldi completed the program at The Freedom Model. Again, at no time—either prior to his compelled admission or after he completed the program— did Sylvester require Rinaldi to take a drug test (which Sylvester was legally empowered to do).  The reason is obvious: Sylvester assumed that Rinaldi would *pass* any test administered to him.

52.     The only drug test that Rinaldi took for the Village was during his pre-hire screening period in 2015, and that test was negative.  Nor did Rinaldi ever have a positive drug test at the in-patient facilities that Sylvester forced him to attend.

53.     Sylvester then temporarily switched from using unfounded accusations of drug use to pretextual attendance infractions to harass Rinaldi. On November 19, 2018 and June 4, 2019, Sylvester issued Rinaldi "chronic sick" warning letters, which stated that Rinaldi had used what Sylvester described as an "excessive" number of sick days.  Sylvester issued those letters to Rinaldi despite the fact that: (i) Sylvester had no prior practice of issuing such letters; (ii) other VOPD officers had taken many more sick days than Rinaldi yet did not receive warning letters; and (iii) members of the PBA, such as Rinaldi, are contractually entitled to use sick time "as needed."

54.     Sylvester's pretextual use of a "chronic sick" list to harass Rinaldi was later confirmed by Sylvester's discontinuance of the list *after* Rinaldi resigned.

13

55.     In 2021, Sylvester seized upon an unfortunate series of events in Rinaldi's private life as a further means to abuse him.  On January 9, 2021, Rinaldi and his fiancé Courtney Burns ("Burns") had a domestic dispute at home.  The VOPD responded to the scene.

56.     On January 13, 2021, Sylvester contacted Burns to schedule a videoconference with him and a Village attorney.  On January 21, 2021, Sylvester contacted Burns again and left her a voicemail trying to get her to "cooperate" against Rinaldi.

57.     On February 9, 2021, Sylvester served Rinaldi with disciplinary charges relating to the domestic dispute he had with Burns on January 9, 2021.  At Sylvester's request, the Village suspended Rinaldi without pay.

58.     On March 12, 2021, the Village also notified Rinaldi that it would no longer pay for his medical insurance.  On behalf of Rinaldi, the PBA grieved the cancellation of Rinaldi's medical coverage, but the Village's determination was upheld by Kahan, the Village corporation counsel.

59.     Once again, Sylvester required Rinaldi to see a substance abuse counselor as a condition of returning to work.  On March 18, 2021, Rinaldi was evaluated by JoAnne Elliott, a certified provider for the New York State Office of Addiction Services and Support, for purported alcohol abuse.  Not surprisingly, Ms. Elliott determined that Rinaldi had "No Apparent Alcohol Problem."  And not surprisingly—because Sylvester was intentionally and falsely accusing Rinaldi of substance abuse—Sylvester was not satisfied by the independent professional's evaluation.

60.     In April 2021—still suspended without pay and deprived of medical coverage for his family—Rinaldi settled his disciplinary charges with the Village by agreeing to participate in a substance abuse treatment program.  Although Sylvester's accusation that

14

Rinaldi had a substance abuse problem was a sham, Rinaldi nevertheless believed that he had no choice but to attend another program if he wanted to keep his job.

61.    From April 21, 2021 to June 16, 2021, Rinaldi, at Sylvester's direction, attended an eight-week, outpatient, early-intervention program at a facility called Inter-Care. During that period, Rinaldi was repeatedly given toxicology screening tests. None of those tests were ever positive for non-prescribed substances or alcohol. The entire punitive experience was just more of Sylvester's harassment.

62.    On November 12, 2021, Rinaldi and Burns had a second domestic dispute at home to which the VOPD responded. *Burns* hit Rinaldi on the head with a harmful object. Despite Burns having physically assaulted Rinaldi, the police did not arrest Burns—which they were required to do by VOPD protocol and section 140.10 of the New York Criminal Procedure Law. Instead, later that day, Sylvester asked Burns to make a statement against Rinaldi, saying, "I know [Rinaldi] claims he's the victim, but I'm not buying it."

63.    On November 16, 2021, Rinaldi filed a harassment complaint against Sylvester with the Village, believing that Sylvester was trying improperly to exploit his domestic problems to harass him further. Rinaldi's complaint ignited even greater retaliation by Sylvester.

64.    Later that month, on November 23, 2021, Burns filed a petition against Rinaldi in Family Court relating to their child custody dispute.

65.    That same day, Sylvester—the chief of the VOPD—personally went to Rinaldi's home to serve him with an order issued by the Family Court. It was no valiant act. Between November 21, 2021 and March 5, 2022, Sylvester hounded Burns to gather evidence and information against Rinaldi. Sylvester coercively led Burns to believe that if she did not

15

cooperate with him, she would "lose her children and have issues with Child Protective Services."

66.    On December 1, 2021, Sylvester notified Rinaldi that he was the "potential subject of disciplinary action in connection with certain matters that have come to the attention of the Village." Rinaldi was also placed on administrative leave effective immediately.

67.    Several days later, on December 7, 2021, Village Manager D'Attore served Rinaldi with disciplinary charges relating to the domestic dispute during which *Rinaldi* was physically assaulted. D'Attore had no first-hand knowledge of the underlying event. The charges also included unsupported and untrue allegations of drug use by Rinaldi.

68.    Upon information and belief, D'Attore issued those charges at the behest of Sylvester, despite her lacking any authority under the Village charter to do so.

69.    The next day, again at the behest of Sylvester, D'Attore notified Rinaldi that the Village had suspended him without pay.

70.    Thereafter, D'Attore, without legal authority, served Rinaldi with multiple versions of amended disciplinary charges.

71.    After D'Attore issued the second set of amended charges on March 6, 2021, Burns repeatedly wrote to the Village to retract her allegations against Rinaldi. Her letters were ignored.

72.    Beginning in April 2021, Sylvester purportedly launched an investigation into anonymous and threating text messages that Hirshowitz was supposedly receiving on her mobile telephone. During his "investigation," Sylvester asked numerous VOPD personnel if they knew whether Rinaldi had sent the messages—clearly indicating that he believed Rinaldi was guilty.

73.     As Sylvester interviewed officers regarding Hirshowitz's text messages, a PBA lawyer told Rinaldi how the VOPD chief was publicly and falsely implicating him in criminal activity.  Rinaldi could not bear any more harassment.  He had already endured *four months* of suspension without pay or medical insurance.  He was the sole financial provider for his children and himself, and experiencing the serious financial duress inflicted on him by Sylvester and the Village.  And now, Sylvester was defaming him among his peers for allegedly harassing a fellow VOPD officer with threatening text messages.  To say that Rinaldi's work environment had become unbearably hostile is a gross understatement.  No reasonable person could tolerate that level of continued abuse.

74.     Fearing additional disciplinary charges and perhaps worse if he did not resign his job, Rinaldi settled his disciplinary charges.  He admitted to a technical violation of the VOPD manual, which requires officers to always conduct themselves in a professional manner.  In exchange for that public surrender, the Village dismissed all other disciplinary charges against Rinaldi.

75.     The enormous disparity between the seriousness of the disciplinary charges (involving alleged domestic violence and drug use) as well as the resulting financial and emotional duress that Rinaldi suffered, and the relative insignificance of the infraction to which Rinaldi ultimately admitted, powerfully indicates that the disciplinary charges were bogus all along.

76.     Knowing that he could not possibly stay at the VOPD any longer because Sylester would continue harassing him as the alleged source of the anonymous and threatening text messages to Hirshowitz, Rinaldi resigned from VOPD on May 10, 2022, to accept a transfer position with the Greenburgh Police Department.

77.     As part of his settlement agreement with the Village resolving his disciplinary charges, Rinaldi demanded a confidentiality provision ("Confidentiality Provision"). In relevant part, the agreement provides:

> [T]he existence, terms, and conditions of this Agreement are and shall be confidential and shall not be disclosed by the Village, Officer Rinaldi, or his attorneys to any person or entity, except to enforce any of the terms of the Agreement or pursuant to subpoena, upon demand of a federal or state agency or as required by law. If a demand for such information is made, and the Village believes it is obligated to provide such information, it will notify Rinaldi's attorney and/or chosen representative of its intent to disclose same.

78.     The Confidentiality Provision was especially important to Rinaldi because he was afraid that the concocted disciplinary charges would, if revealed, prevent him from securing a job as a police officer in another police department. He would not have settled the disciplinary charges without the Confidentiality Provision. Instead, he would have expended the time and money challenging any adverse disciplinary finding by the Village.

79.     But Sylvester never intended to comply with the Confidentiality Provision. To the contrary, he was heard by VOPD personnel repeatedly saying that he was not bound by any agreement involving Rinaldi because he did not sign any agreement. More specifically, Sylvester stated to several officers that he was not bound by the Confidentiality Provision contained in Rinaldi's settlement agreement because "he didn't sign it and the village board was not his boss."

80.     Not surprisingly, Sylvester violated the Confidentiality Provision before the ink was even dry on Rinaldi's settlement agreement. Upon information and belief, Sylvester had several friends employed by News 12, a local Hudson Valley cable news station, including

a specific reporter. Upon further information and belief, despite the Confidentiality Provision, Sylvester intended to disclose the disciplinary charges against Rinaldi to the press before the Village signed its settlement agreement with Rinaldi.

81.     On the day of Rinaldi's resignation, Sylvester learned that Rinaldi had received an employment offer from the Greenburgh Police Department. On information and belief, that same day, Sylvester disclosed to the News 12 reporter Rinaldi's settlement with the Village, the nature of the disciplinary charges against him (including drug use), and that Rinaldi was intending to work for the Greenburgh Police Department

82.     Upon information and belief, *before* News 12 received documents from the Village regarding Rinaldi under the Freedom of Information Law, the News 12 reporter contacted members of the Greenburgh Town Board to tell them that she heard they were hiring a "rogue cop." As an intended result of Sylvester's violation of the Confidentiality Provision, in May 2022, the Greenburgh Police Department rescinded Rinaldi's job offer.

83.     And *after* the News 12 reporter contacted members of the Greenburgh Town Board about Rinaldi, Kahan, on behalf of the Village, responded to News 12's Freedom of Information request. In doing so, however, Kahan failed to redact information that is legally barred from disclosure, including Rinaldi's personal address, social security number, information related to the substance abuse programs he was forced to attend, date of birth, medical history and treatment records, and materials relating to COBRA, workers compensation matters, and other insurance information.

84.     Kahan's improper disclosures were so obvious, egregious, and extensive that they were plainly intentional. Upon information and belief, Kahan abused his official Village position to help Sylvester block Rinaldi from getting another police job. His actions were

entirely spiteful and malicious.

85.     Upon information and belief, Sylvester further violated the Confidentiality Provision by telling other police chiefs in Westchester County that Rinaldi had taken drugs and sending them Rinaldi's disciplinary charges.

86.     After the Greenburgh Police Department rescinded its job offer, Rinaldi submitted numerous job applications to other law enforcement agencies in Westchester County.  He received no responses to those applications.

87.     When approached about hiring Rinaldi, several Westchester police executives said that they could not "touch this" and "would not even consider him for hire." The Westchester Department of Public Safety had the same reaction to Rinaldi's employment efforts, even though it had previously *accepted* Rinaldi's transfer application in November 2017.

88.     Sylvester's unhinged vendetta against Rinaldi was unrelenting.  It grew even more malicious after Rinaldi resigned from the VOPD.

89.     For example, on June 14, 2022, Sylvester was openly ranting to patrol officers and lieutenants falsely accusing Rinaldi of hiring a private investigator to follow him.  In front of numerous officers, Sylvester declared that "if the Rinaldis want to go to war, we will go to war," since "I have deeper pockets than them.  I know that [Louis] is behind this and he will pay."

90.     Approximately two months earlier (in April 2022), Sylvester had launched an internal investigation into anonymous and threatening text messages that Hirshowitz, his romantic partner, had allegedly received.   At that time, Sylvester falsely communicated to VOPD personnel that Rinaldi was the offender.  Sylvester's statements to Rinaldi's colleagues

ultimately forced Rinaldi to resign.  Rinaldi feared that Sylvester would continue to persecute him if he remained at the VOPD.

91.     But, despite Rinaldi's departure, Sylvester's vindictive efforts to incriminate him continued unabated.  In fact, they escalated.

92.     Upon information and belief, Sylvester conspired with Hirshowitz to file manufactured criminal charges against Rinaldi and Zambrano.  The two of them agreed to fabricate evidence of criminal conduct and falsely accuse Rinaldi and Zambrano of criminal harassment.

93.     On May 4, 2022, Hirshowitz submitted a written complaint to the D.A., claiming that she was receiving anonymous and harassing text messages on her personal cell phone, and that "a fellow police officer or multiple officers at my department are involved." Hirshowitz later told the D.A.'s office that she thought Rinaldi and Zambrano were involved in sending her those threatening messages and she gave copies of several text messages that she supposedly received. But Hirshowitz knew that her story was a ruthless lie because *she* had sent the fictitious messages to herself.  And on information and belief, Hirshowitz gave those texts to the D.A. at the behest of and/or in partnership with Sylvester.

94.     The D.A. opened an investigation into Hirshowitz's allegations.  The results were astounding.  A forensic analysis by the D.A.'s investigators of the cell phone numbers and related Google and Apple accounts used in conveying the text messages revealed that Hirshowitz had actually sent them to herself.

95.     At approximately the same time as the D.A.'s office began its investigation, Sylvester claimed also to open a VOPD internal investigation into Hirshowitz's harassment claims.  Sylvester personally oversaw the VOPD investigation and served as the VOPD's

liaison with the D.A.'s office regarding the matter. On information and belief, during his investigation into the threatening text messages, Sylvester independently lodged a complaint with the D.A., directly accusing Rinaldi as the source of those communications.

96.     Sylvester knew his charges against Rinaldi were false and based on fabricated evidence.

97.     At one point during his sham investigation, Sylvester handed a screenshot of a harassing text message that Hirshowitz claimed to receive to a VOPD officer and directed the officer to investigate the sender's anonymous cell phone number, which had been captured in the screenshot. In Sylvester's presence, the officer immediately dialed the screenshot number on his mobile phone. To the surprise of both Sylvester and the officer, *Hirshowitz* answered the call. The cell number identified on the screenshot belonged to Hirshowitz.

98.     Both Sylvester and the officer immediately recognized Hirshowitz's voice, and Sylvester took the officer's mobile phone. Sylvester then stepped away to speak more privately with Hirshowitz. When he ended the call, he made a nonsensical excuse for what had just happened. He told the officer that the association of Hirshowitz's cell number with the threatening text must have been part of the plan to harass her.

99.     On June 28, 2022, Hirshowitz was arraigned in criminal court on seven criminal charges—including three *felonies*. The charges stemmed from Hirshowitz's use of fake text messages to file a maliciously false complaint with the D.A. After Hirshowitz was charged in June 2022, she tried in August 2022 to withdraw her complaint. The D.A. nevertheless maintained the charges.

100.     On information and belief, in response to the criminal charges brought against Hirshowitz, Sylvester told Village officials that Hirshowitz had been set up by Rinaldi and

22

Zambrano.  Sylvester also recommended to Village officials that Hirshowitz *not* be suspended without pay.  In accordance with Sylvester's intervention, and despite *felony* charges pending against Hirshowitz for fraudulently trying to incriminate a fellow officer, the VOPD has not brought any disciplinary charges against her.  She also continues to be on the Village's payroll.

101.    Incredibly, even after Hirshowitz was criminally charged for fabricating and submitting false text messages to the D.A., Sylvester continued his irrational campaign against Rinaldi. At a VOPD department-wide meeting on August 23, 2022, *which was also attended by Mayor Levin and other Trustees*, Sylvester led VOPD personnel to believe that Rinaldi was sending Hirshowitz "disturbing texts."  The attendance of Village officials at that meeting gave credence to Sylvester's knowingly baseless accusations and demonstrated the Village officials' indefensible allegiance to Sylvester.

102.    In fact, Sylvester continued to defend Hirshowitz, his romantic partner and co-conspirator, until the day he "separated" from the VOPD.

**IV.    Sylvester Sadistically and Relentlessly Harasses Zambrano.**

103.    Throughout her nearly four years of employment by the VOPD, Zambrano was a highly respected police officer.

104.    On March 18, 2019, while off duty, Zambrano fractured a finger on her dominant and shooting hand. Zambrano's physician placed her in a hard cast and gave her a letter stating that she could not return to work until April 13, 2019. As required by the PBA contract with the Village, Zambrano was required to furnish a note from her medical provider upon request.

105.    Approximately four days later, on March 22, 2019, Sylvester sent Zambrano an email *ordering* her to complete and return a modified duty questionnaire by March 29, 2019.

23

Sylvester had no prior practice of ordering patrol officers to complete such a form once a medical note was furnished.  Previously, on two occasions, Sylvester merely *requested* that white male and female officers complete the form when they sustained off-duty injuries, and when they failed to do so he let the matter drop.

106.    Within minutes of Zambrano receiving Sylvester's email, at Sylvester's direction, VOPD Captain Jeff Giorgio ("Giorgio") hand-delivered a letter to Zambrano's home reiterating Sylvester's directive. The VOPD had no previous practice of administrative or supervisory staff hand-delivering letters to patrol officers.  Upon information and belief, Sylvester intended to intimidate and harass Zambrano by having his order personally delivered to her home by a superior officer.

107.    Zambrano completed the modified duty questionnaire, as ordered, because she believed it was required to keep her job. On March 29, 2019, she provided the completed form to Sylvester, as directed. On the same date, Sylvester sent Zambrano an email with a letter attachment ordering her back to work on April 1, 2019, on "modified duty," which violated the terms of the CBA contract.  The CBA did not contain any designation or definition for "modified duty."

108.    Sylvester's back-to-work order also conflicted with the medical directive issued by Zambrano's physician, who determined that Zambrano was not medically cleared to return to work until April 13, 2019.

109.    Within minutes of Zambrano receiving Sylvester's email ordering her back to work, and against prior VOPD practice, VOPD Lieutenant Dan Slater ("Slater") appeared at her residence and hand-delivered the same directive.  Upon information and belief, Sylvester intended to intimidate Zambrano by having his back-to-work order personally delivered to her

home by a superior officer.

110.     As ordered by Sylvester, Zambrano appeared at VOPD headquarters on April 1, 2019, because she believed it was required to keep her job. After reporting to work, she requested to go home sick, and VOPD Sergeant Anthony Oliveira ("Oliveira") authorized her to do so.

111.     After she left headquarters to return home, Sylvester asked Olivera specifics about Zambrano's ailment. Prior to this incident, the VOPD had no practice of administrative or supervisory staff requesting details about an ailment. As per the PBA contract, any supervisor or administrative officer may only request a medical note when inquiring about an illness-related absence.

112.     On April 2, 2019, Zambrano called in sick to work and was evaluated at an urgent care facility.

113.     The next day, Slater called Zambrano to remind her that a sick note must be produced justifying her absence upon her return to work. Shortly thereafter, and contrary to prior VOPD practice, Slater followed up his call with an email message reminding her to produce a medical note excusing her absences.  Upon information and belief, Sylvester intended to intimidate and harass Zambrano by having a superior officer order her by both telephone and email to produce a doctor's note.

114.     On April 5, 2019, Zambrano filed a complaint against Sylvester with the Village personnel department, based upon his acts of harassment and discrimination due to her sex, race, and national origin. In that complaint, Zambrano explained to Village officials that she believed Sylvester was treating her differently and more harshly than other VOPD officers because – at that time – she was one of only two female Hispanic officers.  Specifically, she

stated that he discriminated against her on matters involving secondary employment, scheduling, and sick leave.

115.    Zambrano also told the Village that she was concerned about its ability to investigate the harassment complaint impartially, since Sylvester often expressed openly to VOPD personnel that he maintains close personal and influential relationships with the Trustees.

116.    In response to her discrimination complaint, Kahan contacted Zambrano on April 8, 2019. Zambrano again expressed her concern about the impartiality of the investigation if conducted by a Village employee. At that time, Kahan stated that the Trustees may opt to have a person from an "outside agency" conduct the investigation.

117.    On April 10, 2019, Kahan requested that Zambrano meet with him to discuss her complaint.  He told her that, although the Trustees had initially agreed to have an outside party conduct the investigation, they directed Kahan to conduct the investigation himself.

118.    On April 16, 2019, Zambrano met with Kahan to discuss her discrimination complaint.  When the Trustees met on May 8, 2019, they interviewed Zambrano about Sylvester at the very tail end of their meeting.  The Trustees subsequently interviewed Sylvester and Slater on different days. Slater claimed to have little direct knowledge of the discrimination and harassment allegations pressed by Zambrano.

119.    Tellingly, the Trustees concluded their investigation of Sylvester without interviewing Zambrano's direct supervisor or any of her patrol-officer colleagues.  Their investigation was a sham.

120.    On June 13, 2019, Kahan advised Zambrano by letter that the Village concluded that her complaint was unfounded and would take no further action on it.

121.    Between April 5 and June 13, 2019, Sylvester made statements to several VOPD employees regarding his frustration over incurring "out-of-pocket" legal expenses in defending himself against Zambrano's harassment claim.

122.    Subsequently, between August and September 2019, Zambrano requested to change her working shift to the midnight tour, to minimize, among other things, contact with Sylvester.

123.    Not satisfied with his prior efforts to harass Zambrano, Sylvester ramped up his retaliatory efforts. As he did with Rinaldi, Sylvester concocted pretextual attendance infractions with which to charge her.

124.    On October 7, 2019, Sylvester issued Zambrano a "chronic sick" warning letter, which stated that Zambrano had used what Sylvester described as an "excessive" number of sick days. Again, the PBA contract permitted VOPD officers to use sick time "as needed."

125.    The letter further stated that, because Zambrano was placed on the "chronic sick list," she was not permitted to accept voluntary overtime or work secondary employment outside of the VOPD—which the VOPD's general orders typically allow—for a minimum of six months (until April 2016) or until Sylvester saw fit. Upon information and belief, in retaliation for Zambrano's harassment complaint, Sylvester imposed those work restrictions to reduce her financial income significantly, which they most certainly did.

126.    In sum, Sylvester issued the chronic sick letter to Zambrano despite: (i) Sylvester having no prior practice of issuing such letters; (ii) other VOPD officers having taken many more sick days than Zambrano but not receiving warning letters; and (3) members of the PBA, such as Zambrano, being contractually entitled to use sick time "as needed."

127.    Sylvester's discriminatory and pretextual use of a "chronic sick" list to harass

27

Zambrano was later confirmed by Sylvester's discontinuance of the list *after* Zambrano resigned.

128.    On October 13, 2019, Slater approved Zambrano's request to use "holiday" leave for paid time off.  Sylvester then overruled Slater and later denied Zambrano's request, directing Slater to order her to "call in sick" instead.

129.    That same day, Slater, Oliveira, and Sergeant Byrne told Zambrano to "call in sick." Zambrano called in sick because she believed that she had to do so to keep her job. On information and belief, because Zambrano was already on the "chronic sick" list, Sylvester intended to intimidate and harass Zambrano by having her superior officers order her to "call in sick."

130.    Following Sylvester's order to terminate her second job, on October 17, 2019, Zambrano went to Hastings High School, her place of secondary employment, to retrieve her belongings and return her school identification card, keys, and equipment.  At that time, she was told by district administrative personnel that an unidentified member of the VOPD had repeatedly contacted the school, requesting documents regarding her work schedule and secondary employment status.

131.    The VOPD did not have a prior administrative or supervisory practice of contacting places of secondary employment for any other patrol officers.  Upon information and belief, Sylvester intended to intimidate and harass Zambrano by having the VOPD contact Hastings High School about her.

132.    With an unrelenting malicious fervor, the next day, October 18, 2019, Sylvester called Zambrano into VOPD headquarters to meet with him. During that meeting, Sylvester ordered Zambrano to go to Albany to have a "fitness for duty" psychological

evaluation.  The date of the evaluation would be determined, and *Sylvester* would select the evaluator.

133.    Sylvester additionally ordered Zambrano to sign a Health Insurance Portability and Accountability Act ("HIPAA") release form so that Sylvester and his chosen provider could request all of Zambrano's medical records. Zambrano agreed to these demands only because she believed it was necessary to keep her job. The VOPD had no prior practice of ordering a police officer to complete a HIPAA release form for duty evaluation at a location of the chief's choosing.  Upon information and belief, Sylvester intended to intimidate and harass Zambrano by requiring her to release her medical records and submit to a psychological examination.

134.    The only other VOPD officer ordered to provide the HIPAA form and complete such a psychological evaluation was Rennalls, the only other female Hispanic officer in the VOPD aside from Zambrano.

135.    Sylvester did not order Zambrano's white or male co-workers to undergo such evaluations.

136.    Zambrano immediately filed a grievance against Sylvester relating to releasing her medical records.  The Village initially upheld Sylvester's HIPAA directive.

137.    However, after several months, and just prior to the administrative hearing on Zambrano's HIPAA grievance, the Village rescinded Sylvester's order that Zambrano execute the HIPAA form.  It was too late to help Zambrano, however, because her medical records had already been requested and received for her psychological evaluation.

138.    On November 11, 2019, Zambrano hand-delivered Family Medical Leave Act paperwork to Stephen Sage, the Village's personnel director. Zambrano requested to use paid

time off as needed to assist her mother, who was suffering from a deteriorating health condition.

139.    Sylvester argued with Sage about the request and—on that same day and unbeknownst to Zambrano—directed other VOPD personnel to use LPR to surveil the whereabouts of Zambrano's personal vehicles.  New York State's LPR system can track a vehicle's location throughout the state and helps law enforcement agencies to pinpoint the vehicle's specific location at a specific time.

140.    Sylvester directed VOPD personnel to collect multiple years of LPR surveillance data on Zambrano's personal vehicles.  And because Sylvester lacked any good-faith law-enforcement justification for using LPR to follow Zambrano, the VOPD improperly tracked and collected information about her personal comings and goings – as well as the locations of others who used her cars.

141.    Specifically, on five separate occasions between November 11, 2019, and May 6, 2020, VOPD personnel – at Sylvester's direction – conducted 111 LPR system searches targeting Zambrano.  The temporal scope of those searches extended as far back as *November 4, 2017*, resulting in a total period of approximately *2.5 years* during which the VOPD tracked Zambrano.

142.    Over that 2.5-year span, the VOPD reviewed approximately 1600 data points regarding the location of Zambrano's car (often making multiple queries per system search), almost half of which – or approximately 750 data points – covered periods when she was *off* duty.

143.    As a result of tracking Zambrano when she was off duty, the VOPD tracked her on days when she was engaged in private and personal business, such as, for example:

- visiting her dying uncle while he was under hospice care in the Bronx;

- taking her mother to chemotherapy and other cancer treatment appointments;

- attending her own medical appointments, including numerous visits to her OB/GYN specialist;

- vacationing out of state with her then-fiancée;

- socializing with police-squad colleagues; and even

- celebrating *Christmas Eve* with her family at her parents' home.

144.    The VOPD's arbitrary, malicious, and invasive surveillance of Zambrano was apparently a source of continuing satisfaction for Sylvester.  On April 1, 2020, Sylvester suspended Zambrano from her job without pay.  Once suspended, Zambrano was under no work restrictions by the VOPD, and Sylvester lost any conceivable work-related justification for tracking her.

145.    Nevertheless, Sylvester continued to track Zambrano for at least 35 days following her suspension.  To support herself, Zambrano had taken a temporary position as a paramedic for Westchester Emergency Medical Services in Mount Kisco, New York, to help staff its COVID-19 response team.  Aware from LPR reports that Zambrano had traveled to the same place for at least 22 of those 35 days, Sylvester intrusively remarked to a member of the VOPD, "wow, Zambrano is working a lot these days."

146.    But unlawfully tracking Zambrano was just one component of Sylvester's broader plan to harass her.  As early as mid-November 2019, approximately when he ran the first LPR report on her car, Sylvester and Kahan discussed terminating Zambrano and suspending her without pay, pending termination.  At that point, Kahan had not even asked to

review any evidence in support of Sylvester's disciplinary allegations. Their joint effort to terminate Zambrano thus began five months *before* Zambrano was served with any departmental disciplinary charges.

147.    On November 24, 2019, Sylvester's chosen psychological evaluator for Zambrano's fitness evaluation submitted his report stating that Zambrano was "unfit for duty as a police officer." The report was a sham.

148.    On December 5, 2019, *11 days* after Sylvester received that psychological report, Zambrano was first ordered to appear at VOPD headquarters and informed by Giorgio that she was being placed on involuntary leave of absence effective immediately. In other words, Sylvester allowed a police officer who was supposedly psychologically "unfit for duty" to remain on duty for *11* days. That sort of reckless neglect is easily explained here: Sylvester allowed a supposedly mentally unfit police officer remain on duty because he knew that Zambrano's psychological evaluation was false.

149.    On December 6, 2019, Zambrano's attorney informed the Village that Zambrano was accepting this involuntary leave of absence only because it was a part of Sylvester's ongoing harassment.

150.    Not surprisingly, after undergoing a second psychological examination by an independent evaluator a short time later, Zambrano was cleared for full duty and returned to full duty on January 8, 2020.

151.    The next onslaught quickly followed. On January 28, 2020, Sylvester personally went to Zambrano's home, where he taped a letter to the front door ordering her to appear on February 6, 2020 at VOPD headquarters for questioning. Zambrano complied only because she believed it was required to keep her job.

152.     On February 6, 2020, Zambrano was questioned at a disciplinary interview by Sylvester and an attorney hired by the Village.

153.     On March 27, 2020, over one month after Zambrano had her disciplinary interrogation and weeks before she was eligible to come off the "chronic sick" list (and thereby resume secondary employment), Zambrano was placed on administrative leave, effective immediately.

154.     On April 1, 2020, *five* months after Sylvester discussed terminating Zambrano with Kahan, Sylvester served Zambrano with disciplinary charges and the Village suspended her without pay. It was an unparalleled and unprecedented act of disparate treatment, designed to coerce her resignation. In an unsupported act of vindictive malice, Sylvester and the Village deprived Zambrano of her salary despite the onset of the COVID-19 pandemic.

155.     The PBA sharply protested Zambrano's mistreatment. In a letter to the Village's then-mayor and Trustees, the union wrote "to express its extreme displeasure at the Police Department's and Village Board Member's handling of the Andrea Zambrano matter." The PBA was "extremely disturbed" that the VOPD and Trustees found "it appropriate and necessary to suspend an officer and deprive her of her pay during a pandemic" based on "unproven allegations." Underscoring that Zambrano was "neither eligible for the emergency $1200 federal stimulus check, nor eligible for unemployment insurance" while she was suspended and was thus "unable to provide for herself for months during these dark times," the letter condemned the Village's actions as "grossly disproportionate" to the "technical infraction" with which Zambrano was charged. Zambrano had merely been cited for "allegedly working too much for another employer, in an attempt to pay off her student loans" and had "already resigned from that position [seven months before] due to the Chief's orders." The

Trustees' decision "to seek termination and to knowingly deprive Officer Zambrano of pay during a pandemic," the PBA called out, was "shameful and unconscionable." A true and correct copy of the PBA's letter, dated April 14, 2020, is annexed as Exhibit E.

156.    Sylvester filed those disciplinary charges even though Giorgio and VOPD Lieutenant Aaron Zimmerman recommended *against* doing so. Both officials had told Sylvester that there was insufficient evidence to support disciplinary charges. And Zambrano never had any prior disciplinary actions or even negative evaluations.

157.    Sylvester's malice and flagrant abuse of power is further underscored by his continued surveillance of Zambrano. On April 17, 2020, and again on May 6, 2020, *while Zambrano was suspended without pay*, Sylvester again accessed the LPR system to track unlawfully the whereabouts of her car. He had no justifiable basis for doing so and his actions showed a wanton disregard for Zambrano's reasonable expectation of privacy.

158.    Further, while Zambrano was suspended without pay awaiting a disciplinary hearing, Sylvester also openly and falsely stated to VOPD personnel and Village officials that she sent Hirshowitz and the Village harassing communications. Based upon Sylvester's continuing and escalating harassment, Zambrano reasonably concluded that she could not remain at the VOPD.

159.    On July 8, 2020, after losing her VOPD salary for four months and without a set date for a disciplinary hearing due to the COVID-19 restrictions, Zambrano was coerced into settling her disciplinary charges and signing a confidential separation agreement and general release of claims against the Village.

160.    Zambrano's settlement agreement provided, in part, that, "if a prospective employer contacts the Village regarding my potential employment, consistent with its' [sic]

practice the Village will provide the prospective employer with salary information and dates of employment only" ("Disclosure Limitation"). Zambrano would not have agreed to settle her disciplinary charges without the Disclosure Limitation. She feared that Sylvester, or other Village personnel on Sylvester's behest, would otherwise continue to harass and retaliate against her by communicating disciplinary-related information to prospective employers to stop them from hiring her.

161. But, upon information and belief, Sylvester never intended to comply with the Disclosure Limitation. Again, Sylvester openly stated that he was not bound to a settlement agreement that he did not sign—and he did not sign Zambrano's settlement agreement.

162. Importantly, Zambrano signed that separation agreement and resigned from VOPD on July 8, 2020, only because she believed that the Westchester County Department of Public Safety had accepted her as a transfer candidate.

163. Starting in November 2019, when Sylvester maliciously forced Zambrano to undergo a psychological fitness evaluation with a psychologist of his choosing, Zambrano had begun pursuing a transfer to another Westchester County police department. She interviewed with several departments, including the New Castle Police Department, the Westchester County Department of Public Safety, and the Greenburgh Police Department.

164. On July 9, 2020, Sylvester and Village officials learned that Zambrano intended to pursue a job with the Westchester County Department of Public Safety. Upon information and belief, Sylvester promptly breached the Disclosure Limitation and derailed that specific employment opportunity and others. After Zambrano resigned from the VOPD, Sylvester, upon information and belief, told Westchester County police chiefs not to hire Zambrano. Upon their inquiries regarding Zambrano's job applications, Sylvester disparaged

Zambrano as a police officer, thus preventing her to this day from securing another law-enforcement job.

165.    On November 21, 2022, Zambrano submitted several FOIL requests to the Village for documents, including her own VOPD personnel file.  By those requests, Zambrano sought to investigate, among other things, what materials, if any, the VOPD had sent to prospective employers after she resigned.

166.    On December 14, 2022, Kahan informed Zambrano that the VOPD needed more time to produce several requested documents. On December 15, 2022, Zambrano responded to Kahan via email demonstrating that certain records she requested—but the Village had not produced—existed on a Google shared drive accessible by Sylvester, and that the VOPD did not need more time to share documents that were already available in digital format.

167.    Zambrano was frustrated, having first requested her own personnel file in March 2020.  When Zambrano asked Kahan what the VOPD was hiding, he sent a menacing response "strongly recommending" that she not make such allegations.

168.    Thereafter, Zambrano sent a follow-up email to the Village and Kahan and requested a different Village official to assist her in getting the records to which she was entitled. On December 20, 2022, Kahan responded by email, again stating that the "PD needs more time." To date, the Village has failed to comply fully with Zambrano's FOIL requests and has unlawfully refused to release her entire personnel file.

169.    Upon information and belief, Kahan has knowingly assisted, and continues to assist, Sylvester in violating Zambrano's legal rights.

V.    **Sylvester's Abrupt "Separation" from the Village.**

170.    On December 5, 2023, a local Westchester newspaper reported that Sylvester had informed the Village that he was stepping down as VOPD chief and that he would be leaving at the end of the year.  The news story also reported that the Trustees were scheduled to approve a separation agreement between Sylvester and the Village at their meeting on December 6, 2023. The Trustees unanimously approved Sylvester's separation agreement at their meeting on December 6, 2023.

171.    Considering that Sylvester's contractual tenure as VOPD chief was scheduled to end by its own terms several weeks later, the need for a separation agreement between the Village and Sylvester is highly suspect.  Upon review of the separation agreement's terms, that concern only grows larger.

172.    Although the Village designated the separation agreement as "confidential" and, at first, refused to make it publicly available, the Village finally released a copy of it in the first week of January 2024. *See* Exhibit A.

173.    The document states that it is "in the mutual best interests" of the Village and Sylvester "to enter into this Confidential Separation Agreement . . . as a way of amicably resolving all matters related to Sylvester's retirement."  The agreement requires Sylvester's "unconditional and irrevocable retirement" and in "exchange for Sylvester's unconditional and irrevocable resignation," the Village will pay him a lump sum of approximately $162,000 together with other substantial benefits.  The agreement nowhere explains, however, why the Village would need to pay Sylvester a $162,000 departure bonus when his contract was set to terminate later that month.

174.    For his part, Sylvester must "reasonably cooperate in good faith with the

Village . . . on pending and future litigation . . . related to his employment," including federal and state civil rights claims and litigation against the Village "pertaining to Sylvester's employment."

175.    Among other things, both parties also agree to keep strictly secret the agreement's terms, the history of its negotiations, and "the facts and circumstances underlying" their pact, and further mutually release each other from any and all claims that they might have.

176.    More than anything else, the "separation" agreement between Sylvester and the Village outlines the anatomy of their unlawful arrangement.  It is a disgraceful bargain to cover- up their policy and practice of violating Plaintiffs' federal constitutional rights as well as Plaintiffs' state law rights in the process of doing so.

**CAUSE OF ACTION I (Rinaldi)**
**As Against Syvester, Hirshowitz, and the Village**
**Violation of 42 U.S.C. § 1983 – Due Process/Fabricated Evidence**

177.    Plaintiffs repeat and reallege the preceding allegations in paragraphs 1 through 176 with the same force as if fully set forth here.

178.    As VOPD police chief, Sylvester was the final decision and policy maker for the VOPD regarding daily departmental operations, including investigatory tactics, work schedules, and setting internal standards for police conduct.

179.    Upon information and belief, beginning in the Spring of 2022, Sylvester and Hirshowitz conspired to fabricate false evidence that Rinaldi sent threatening and harassing text messages to Hirshowitz.  By doing so, Hirshowitz intended to help Sylvester force Rinaldi to resign from the VOPD.

180.    As part of their conspiracy, Hirshowitz created anonymous text messages with the assistance and/or at the behest of Sylvester and sent them to herself.  She then filed a

criminal complaint with the D.A.'s office and identified Rinaldi as the person she believed sent the texts.

181.    For his part, Sylvester viciously and falsely told members of the VOPD and elected Village officials that Rinaldi was responsible for harassing text messages. And, upon information and belief, and as part of a sham internal VOPD investigation, Sylvester independently filed a criminal complaint with the D.A.'s office accusing Rinaldi of sending threatening text messages to Hirshowitz – all of which Sylvester knew were fabricated.

182.    Rinaldi reasonably believed that, after Sylvester told other VOPD personnel that Rinaldi sent those threatening texts to Hirshowitz, he could no longer work for the VOPD. And approximately 3 to 4 days after Sylvester filed a complaint against Rinaldi, Rinaldi resigned from the VOPD. Indeed, Sylvester's malicious conduct regarding the fabricated evidence was one of the primary reasons why Rinaldi was forced to leave his job.

183.    As a non-probationary member of the VOPD for years, Rinaldi had a protectable property interest under State law in his job.

184.    Because fabricated evidence and false criminal charges by Sylvester and Hirshowitz ultimately forced Rinaldi to resign from the VOPD, Rinaldi was deprived of property without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

185.    And as a direct result of that due process violation, Rinaldi has suffered tremendous financial and other damages.

## CAUSE OF ACTION II (Rinaldi)
### As Against the Village
### Breach of Contract

186.    Plaintiffs repeat and reallege the preceding allegations in paragraphs 1 through

185 with the same force as if fully set forth here.

187.    At all times relevant to this action, Sylvester was an agent of the Village, and the Village was legally responsible for Sylvester's conduct undertaken within the scope of his employment.

188.    Upon information and belief, Sylvester was directly involved in drafting the agreement by which Rinaldi settled his disciplinary charges with the Village. Sylvester was fully aware of the contents of the agreement, including the Confidentiality Provision, before the parties signed it.

189.    Rinaldi resigned from his job and signed the agreement only because the agreement included the Confidentiality Provision. He relied upon the Confidentiality Provision to protect him against efforts by Sylvester to block him from getting a job with another police department.

190.    But all along, Sylvester intended to do just that—to stop Rinaldi from getting another police job. Thus, even before the parties signed the agreement, Sylvester planned to breach the Confidentiality Provision. In fact, Sylvester breached it almost immediately.

191.    In violation of the Confidentiality Provision, Sylvester disclosed information and details regarding Rinaldi's settlement of disciplinary charges with the Village. Specifically, Sylvester disclosed details of Rinaldi's alleged substance abuse to a local cable television news station and other police departments in Westchester.

192.    At all times relevant to this action, Kahan was an agent of the Village, and the Village was legally responsible for Kahan's conduct undertaken within the scope of his employment.

193.    Like Sylvester, Kahan violated the Confidentiality Provision by disclosing

information and details of Rinaldi's disciplinary charges and alleged substance abuse to a local cable television news station.

194.    Because of Sylvester's and Kahan's improper disclosures, the Village breached its settlement agreement with Rinaldi.

195.    As a direct result of that breach, Rinaldi has suffered tremendous financial and other damages.

## CAUSE OF ACTION III (Rinaldi)
### As against Defendants Sylvester, Kahan, and the Village
### Tortious Interference with Prospective Business
### Opportunities

196.    Plaintiffs repeat and reallege the preceding allegation in paragraphs 1 through 195 with the same force and effect as if set forth her.

197.    At all times relevant to this action, Sylvester wielded great power and influence over other police chiefs and departments in Westchester County because he was President of both the Westchester County Chief's Association Executive Board of the New York State Association of Police Chiefs and the New York State Police Association.

198.    Sylvester used his influence and power to interfere with various employment opportunities that Rinaldi pursued with several Westchester County law enforcement agencies. Specifically, upon information and belief, when Sylvester learned that the Greenberg Police Department had accepted Rinaldi's transfer application, Sylvester maliciously communicated with a local cable news reporter intentionally prompting the reporter to notify Greenburgh officials that they were hiring a "rogue" cop.

199.    Upon further information and belief, Sylvester also falsely and maliciously told officials from other police departments in Westchester County not to hire Rinaldi,

41

citing the substance abuse allegations and other unsupported accusations of misconduct contained in the disciplinary charges that Rinaldi had settled with the Village. Sylvester's desire to harm Rinaldi was his sole motivation in communicating with other Westchester County police officials regarding Rinaldi's future employment.

200.    Because of Sylvester's interference with Rinaldi's efforts to be re-hired as a law enforcement officer, Rinaldi's job offer from the Greenburgh Police Department was rescinded and he was unable to secure an offer from any of the other several police departments to which he had applied.

201.    As a direct result of Sylvester's malicious interference with Rinaldi's job search, Rinaldi has suffered tremendous financial and other damages.

**CAUSE OF ACTION IV (Zambrano)**
**As against Defendants Sylvester, the Trustees, and the Village**
**Violation of 42 U.S.C. § 1983 – Equal Protection/Gender-**
**Race Discrimination**

202.    Plaintiffs repeat and reallege the preceding allegations in paragraphs 1 through 201 with the same force as if fully set forth here.

203.    Upon information and belief, Sylvester intentionally discriminated against Zambrano based on her gender, race, and national origin.

204.    His discriminatory harassment and disparate treatment of Zambrano is evident in almost everything he did to her.

205.    Sylvester harassed Zambrano for having a broken finger that medically required more time off to heal than he arbitrarily concluded was justified.

206.    He harassed her by spitefully placing her on a "chronic sick" list and requiring her to terminate her secondary employment, which she needed to support herself.

207.    He harassed her by baselessly ordering her (and the only other female Hispanic officer) to go for a sham psychological fitness evaluation by a psychologist of his choice and then suspending her from duty as unfit when he knew she was perfectly fit to serve without restriction.

208.    He harassed her by unlawfully using LPR for more than 2.5 years to track her personal whereabouts in hopes of constructing a disciplinary charge.

209.    He harassed her by wrongfully demanding that she return her weapon while placing her on modified duty so that she was left alone on numerous shifts late at night in the police station with prisoners and without protection.

210.    He harassed her by filing disciplinary charges against her despite the recommendations of senior personnel not to do so because they could not construct a viable case against her.

211.    He harassed her by having her suspended without pay during the pendency of her sham disciplinary proceedings even though the COVID-19 pandemic left her in unsalaried limbo for months.

212.    Sylvester's abusive and discriminatory bias against female Hispanic police officers is equally clear from his treatment of Zambrano and Rennalls (the only other Hispanic female officer employed by the VOPD).

213.    For example, Sylvester did not: (i) scrutinize or surveil numerous officers who had worse attendance records than Zambrano; (ii) surveil, investigate, or scrutinize male officers who had secondary employment; (iii) surveil white female officers; (iv) harass white female officers who had worse performance evaluations than Zambrano; or (v) force white female officers similarly situated to Zambrano to undergo psychological "fitness for duty"

43

evaluations, although Zambrano and Rennalls were both required to do so after they both filed harassment complaints against Sylvester.

214.    Indeed, the difference in treatment that Zambrano and Rennalls received regarding their psychological fitness for duty as compared to the way Sylvester treated a Caucasian female officer is shocking.  On information and belief, a Caucasian female member of the VOPD was detained by another police department while holding a knife to her own chest. But unlike Zambrano and Rennalls, who never showed any such potentially self-destructive conduct, she was not required by Sylvester to undergo a psychological "fitness for duty" evaluation.  And despite her apparent suicidal behavior, she was neither suspended from work *nor prevented from using her weapon while on duty*, as was Zambrano.

215.    Sylvester's grossly disparate treatment of Zambrano is also epitomized by:  (i) his recommendation to Village officials that Hirshowitz *not* be suspended without pay, despite the felony charges against her for fraudulently trying to incriminate a fellow officer; and (ii) the VOPD's refusal to bring any disciplinary charges against Hirshowitz while, instead, keeping her on the payroll for months pending her criminal trial.

216.    Sylvester's discriminatory intent was made clear by an overtly bigoted statement he was witnessed to have made against Rennalls.  Sylvester reportedly said that Rennalls was "useless" and "could do nothing" to stop him from pushing her out of the VOPD because she is a Hispanic woman.  *See* Exhibit C.

217.    Sylvester's gender- and race-based harassment created a hostile work environment and coerced Zambrano to resign from her job as a VOPD officer.

218.    That harassment violated Zambrano's right to equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

44

219.     As a direct result of that equal protection violation, Zambrano has suffered extensive damages, including a fatal blow to her professional career as a law enforcement officer.

## CAUSE OF ACTION V (Zambrano)
### As Against Defendants Sylvester, the Trustees, and the Village
### Violation of 42 U.S.C. § 1983 – Unreasonable Search
### Without a Warrant

220.     Plaintiffs repeat and reallege the preceding allegations in paragraphs 1 through 219 with the same force as if fully set forth here.

221.     Sylvester was the final decisionmaker for the VOPD in matters of investigatory strategies.

222.     Beginning in November 2019 and running through May 2022, Sylvester directed VOPD personnel to track Zambrano's personal cars with LPR.  Sylvester did so without having a good-faith law-enforcement justification for surveilling Zambrano's whereabouts for *over two and one-half years*.  LPR records show that VOPD personnel accessed the system 111 times, collecting approximately 1600 location data points, to gather information on Zambrano spanning periods of many months.  For that entire period, Zambrano had no idea that she was being tracked by fellow VOPD law-enforcement officers.

223.     Sylvester tracked Zambrano's cars with LPR during her scheduled work hours, when she was off duty, and *when she was suspended from duty without pay for more than month*. By doing so, Sylvester was able to discern the location of anyone who used Zambrano's cars on any specific date, so long as they triggered an LPR detection camera.  People who drove Zambrano's cars besides Zambrano were therefore also unknowingly tracked by the police.

224.     Zambrano was not the only VOPD officer that Sylvester tracked with LPR.

Upon information and belief, LPR records show that Sylvester similarly tracked detective Edward Warker, a Black male, who is another member of the VOPD that Sylvester coerced into resigning his job.

225.    Sylvester's abusive tracking practices violated federal and state restrictions on the use of federally funded LPR systems by local law enforcement authorities and the VOPD knew it.  For example, LPR tracking data reports prepared by the law-enforcement agencies must include a police case number and a brief investigatory explanation for using the information.  The LPR reports for Zambrano's cars contained neither entry.

226.    At present, Plaintiffs do not know whether or to what extent Sylvester used LPR to track other people without having a good-faith law-enforcement justification for surveilling them.

227.    Sylvester's practice of using LPR to track vehicles for months at a time without a search warrant issued by a court of competent jurisdiction violates the bar against unreasonable searches as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

228.    By using LPR to track Zambrano's cars without a warrant for over two and one-half years, Sylvester violated her Constitutional guarantee against unreasonable police searches.

229.    As a direct result of that Fourth Amendment violation, Zambrano suffered substantial injury to her right of personal privacy and financial damages.

### CAUSE OF ACTION VI (Zambrano)
### As Against the Village
### Breach of Contract

230.    Plaintiffs repeat and reallege the preceding allegations in paragraphs 1 through

229 with the same force as if fully set forth here.

231.    Upon information and belief, Sylvester was directly involved in drafting the agreement by which Zambrano settled her disciplinary charges with the Village. Sylvester was fully aware of the contents of the agreement, including the Disclosure Limitation, before the parties signed it.

232.    Zambrano resigned from her job and signed the agreement only because the agreement included the Disclosure Limitation. Zambrano relied upon the Disclosure Limitation to protect her against efforts by Sylvester to block her from getting a job with another police department.

233.    But all along, Sylvester intended to do just that—to stop Zambrano from getting another police job. Thus, even before the parties signed the agreement, Sylvester planned to breach the Disclosure Limitation. In fact, Sylvester breached it almost immediately.

234.    Upon information and belief, Sylvester violated the Disclosure Limitation by sharing with Zambrano's prospective employers confidential details about Zambrano's VOPD employment. Specifically, Sylvester improperly disclosed information about Zambrano's dismissed disciplinary charges.

235.    Because of Sylvester's improper disclosures, the Village breached its settlement agreement with Zambrano, and Zambrano was unable to obtain employment as a law-enforcement officer elsewhere. Indeed, she has been forced to abandon her law-enforcement career.

236.    As a direct result of that breach, Zambrano has suffered tremendous financial damages.

**CAUSE OF ACTION VII (Zambrano)**
**As against Defendants Sylvester and the Village**
**Tortious Interference with Prospective Business Relations**

237.    Plaintiffs repeat and reallege the preceding allegations in paragraphs 1 through 236 with the same force as if fully set forth here.

238.    In addition to filing a timely notice of claim, Zambrano repeatedly testified at her General Municipal Law § 50-h hearing that, after she resigned from the VOPD, Sylvester was both involved in and the cause of her inability to gain employment with other Westchester County police departments.

239.    Upon information and belief, as with Rinaldi, Sylvester used his influence with officials from several other police departments in Westchester County to block Zambrano from getting a law-enforcement job.  Specifically, Sylvester maliciously interfered with Zambrano's transfer application to work for the Westchester County Department of Public Safety once he became aware that she intended to work there after she resigned from the VOPD.

240.    Sylvester's desire to harm Zambrano was his sole motivation in communicating with other Westchester County police officials regarding her future employment.

241.    As a direct result of Sylvester's improper interference with Zambrano's efforts to work for other Westchester County law-enforcement agencies, Zambrano has suffered tremendous financial damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant judgment to them as follows:

(i)      on CAUSE OF ACTION I, awarding Rinaldi compensatory and punitive damages and granting litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

(ii)     on CAUSE OF ACTION II, awarding Rinaldi compensatory damages;

(iii)    on CAUSE OF ACTION III, awarding Rinaldi compensatory damages;

(iv)    on CAUSE OF ACTION IV, awarding Zambrano compensatory and punitive damages and litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

(v)     on CAUSE OF ACTION V, awarding Zambrano compensatory and punitive damages, enjoining the Village from using the New York State LPR system unlawfully, and granting litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

(vi)    on CAUSE OF ACTION VI, awarding Zambrano compensatory damages;

(vii)   on CAUSE OF ACTION VII, awarding Zambrano compensatory damages; and

(viii)  such other and further relief as the Court deems just and proper.

Dated: New York, New York
       October 16, 2024

BROADFIELD, LLP

By: _____

Daniel S. Alter
*Attorneys for Plaintiffs Louis R. Rinaldi*
*and Andrea K. Zambrano*
450 Madison Avenue, 33rd Floor
New York, NY 10022
(212) 390-1256
danielalter@broadfieldlaw.com

Lisa M. Florio
*Attorneys for Plaintiffs Louis R. Rinaldi
and Andrea K. Zambrano*
Abrams Fensterman, LLP
81 Main Street, Suite 400
White Plains, NY 10601
lflorio@abramslaw.com
(914) 607-7010

Michael G. Santangelo
Law Office of Michael G. Santangelo
PLLC
*Attorneys for Plaintiffs Louis R. Rinaldi
and Andrea K. Zambrano*
75 South Broadway
Suite 4-54195
White Plains, New York 10601
(914) 304-4242
mgsesq@msn.com